# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CITY OF PITTSBURGH
COMPREHENSIVE MUNICIPAL
PENSION TRUST FUND, directly on
behalf of itself and all other similarly
situated stockholders of THE
CARLYLE GROUP INC. and
derivatively on behalf of THE
CARLYLE GROUP INC.,

        Plaintiff,

        v.

WILLIAM E. CONWAY, JR.,
DANIEL A. D'ANIELLO, DAVID M.
RUBENSTEIN, PETER CLARE,
JAMES H. HANCE JR., KEWSONG
LEE, GLENN YOUNGKIN,
ANTHONY WELTERS, LAWTON
FITT, HELEN DOOLEY AS
EXECUTOR FOR THE ESTATE OF
JANET HILL, WILLIAM J. SHAW,
DR. THOMAS S. ROBERTSON,
CURTIS BUSER, JEFFREY
FERGUSON, CHRISTOPHER FINN,
THE CARLYLE GROUP
MANAGEMENT L.L.C., THE
CARLYLE GROUP INC., CARLYLE
HOLDINGS I GP INC., CARLYLE
HOLDINGS I GP SUB L.L.C., and
CARLYLE HOLDINGS II GP L.L.C.,

        Defendants,

    and

THE CARLYLE GROUP INC.,

        Nominal Defendant.

C.A. No. 2022-0664-MTZ

# MEMORANDUM OPINION

Date Submitted: September 13, 2023
Date Decided: April 24, 2024

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Christopher H. Lyons, Tayler D. Bolton, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, Benny C. Goodman III, Andrew W. Hutton, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Gladriel Shobe, Jarrod Shobe, SHOBE & SHOBE, LLP, Provo, Utah, *Attorneys for Plaintiff City of Pittsburgh Comprehensive Municipal Pension Trust Fund*.

Blake Rohrbacher, Matthew D. Perri, Nicole M. Henry, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Robert A. Van Kirk, John Williams, Tyler Infinger, Bryan Czako, William Donnelly, WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Defendants William E. Conway, Jr., Daniel A. D'Aniello, David M. Rubenstein, Peter Clare, James H. Hance Jr., Kewsong Lee, Glenn Youngkin, Lawton Fitt, Helen Dooley as executor for the estate of Janet Hill, William J. Shaw, Anthony Welters, Dr. Thomas S. Robertson, Curtis Buser, Jeffrey Ferguson, Christopher Finn, Carlyle Group Management L.L.C., Carlyle Holdings I GP Inc., Carlyle Holdings I GP Sub L.L.C., and Carlyle Holdings II GP L.L.C., and Defendant and Nominal Defendant The Carlyle Group Inc.*

**ZURN, Vice Chancellor.**

The Carlyle Group LP ("Carlyle LP") was indirectly controlled by its three founders. After Carlyle LP went public as a publicly traded partnership in 2012, the founders and other pre-IPO investors (together, the "Private Unitholders") held equity in three subsidiary holding companies that they could exchange for publicly traded Carlyle LP units. Those exchanges were treated as sales for tax purposes, meaning the Private Unitholders paid taxes at the time of exchange. But the exchanges could also generate future tax benefits for Carlyle LP. Carlyle LP and the Private Unitholders entered into a tax receivable agreement (the "TRA"), which allowed the Private Unitholders to share in those potential benefits via payments that could amount to hundreds of millions of dollars. But there was no guarantee the exchanges would generate any payments under the TRA or the amount of those future payments. And if such payments were made, they could be spread out over fifteen years or longer. As it turned out, Carlyle LP had little to no taxable income as was necessary to generate TRA payments, and consequently made few payments.

In 2019, Carlyle LP began considering converting to a corporation. The conversion was expected to greatly benefit both the public unitholders and the Private Unitholders. The new corporate structure would effectively preclude TRA payments for any future exchanges. And the company had no legal obligation to compensate the Private Unitholders for a conversion's effective elimination of their TRA rights. In other words, converting to a corporation would effectively render

1

the TRA rights worthless. But because the founders and some of the other Private Unitholders could block the conversion, Carlyle LP reached an agreement to pay the Private Unitholders $344 million for the loss of their TRA rights. The conversion was completed in 2020.

Plaintiff City of Pittsburgh Comprehensive Municipal Pension Trust Fund ("Plaintiff") asserts claims arising out of the negotiation and approval of the TRA rights payment, among other things. Plaintiff reasons that because the TRA rights were worthless to the holders and the conversion was the best path forward for the Private Unitholders and public unitholders alike, the founders and other Private Unitholders lacked the leverage to demand such a payment. In short, Carlyle LP paid $344 million for the TRA rights despite there being no economic case for doing so.

Plaintiff presents its theory primarily as a breach of obligations to proceed in good faith set forth in Carlyle LP's partnership agreement. For Plaintiff to bring that claim, neither of two safe harbors in the partnership agreement can apply.

One of the safe harbors establishes a conclusive good faith presumption where Carlyle LP's conflicts committee approves the transaction at issue. But there is a common law exception: that safe harbor does not bar claims where the defendant undermined the safe harbor's protections for unaffiliated investors. Plaintiff satisfies this exception by pleading Carlyle LP's general partner, acting through various

2

defendants in this action, concealed or obfuscated material information from the conflicts committee to ensure it did not learn the Private Unitholders lacked the leverage to extract a payment for their TRA rights. At the pleading stage, Plaintiff has established that the good faith safe harbor is unavailable. Plaintiff has also pled the same conduct gives rise to a breach of the limited partnership agreement's implied covenant.

The other safe harbor affords a conclusive good faith presumption where the decisionmaker relied on advice from advisors it selected. At this stage, the pleadings demonstrate Carlyle LP's general partner did not rely on any such advice. That safe harbor is not available either.

Plaintiff also brings a series of claims focusing on an apparent overissuance of corporate stock in connection with the conversion. Before the conversion, the Private Unitholders held about 229 million subsidiary holding company units. Despite the understanding that the $344 million compensated for the effective loss of the Private Unitholders' TRA rights, the transaction documents required the Private Unitholders to relinquish units worth $344 million to receive those payments. That figure was later determined to be 26.3 million units. After that initial transfer, the Private Unitholders would exchange the balance of their units for publicly traded corporate stock on a one-to-one basis. Based on the planned transfer of 26.3 million units, the Private Unitholders should have received about 201.7 million shares of

3

corporate stock. But when the transactions were completed, they received over 228 million shares. Plaintiff adequately pled the initial transfer never happened, which supports claims under several legal theories.

## I.    BACKGROUND[1]

Carlyle LP was a Delaware limited partnership and a "global investment firm."[2] Defendants William E. Conway, Jr., Daniel A. D'Aniello, and David M. Rubenstein (collectively, the "Founders") founded Carlyle LP's predecessor entity in 1987. The Founders controlled a majority of the voting rights of Carlyle LP's general partner, Carlyle Group Management LLC ("Carlyle Management").[3] Carlyle Management was responsible for Carlyle LP's day-to-day operations[4] and

---

[1] Citations in the form "Am. Compl." refer to Plaintiff's amended complaint in this action, available at docket item ("D.I.") 15. Citations in the form "Henry Aff." refer to the affidavit of Nicole M. Henry, available at D.I. 24. Citations in the form "Foulds Aff." refer to the affidavit of Christopher M. Foulds, available at D.I. 29.

     The facts are drawn from the operative complaint, the documents integral to it, and those incorporated by reference. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Plaintiff demanded and received books and records before filing its complaint in this action. That production was made pursuant to an agreement providing that documents Carlyle LP produced "will be deemed incorporated by reference in the Complaint." Henry Aff., Ex. 2 ¶ 6. Those books and records are incorporated by reference. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796–99 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). Further, "[t]he court may take judicial notice of facts publicly available in filings with the SEC." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002).

[2] Am. Compl. ¶ 47.

[3] *Id.* ¶ 45.

[4] Henry Aff., Ex. 4 § 7.1(a) [hereinafter "LPA"].

4

had no "business activities other than managing and operating" Carlyle LP.[5] Carlyle Management's board of directors served as Carlyle LP's board of directors (the "Board").[6]

Rubenstein and Conway served as Carlyle Management directors and Carlyle Management's co-CEOs.[7] D'Aniello served as chairman of the Board. The Board included three other directors at the time, including defendants Glenn Youngkin and Jeffrey Ferguson, who also served as Carlyle Management's COO and general counsel, respectively.[8] Other defendants in this action were also affiliated with both Carlyle LP and Carlyle Management, including defendant Curtis Buser, who served as both entities' CFO.[9]

### A. Carlyle LP's IPO

In 2012, Carlyle LP went public through an initial public offering, or IPO, and public investors acquired units in the publicly traded partnership. The Founders and other Private Unitholders held equity in Carlyle LP subsidiaries rather than the public entity. This was, at bottom, for tax reasons.

---

[5] The Carlyle Group LP, Form 10-K (Annual Report), at 15 (Feb. 13, 2019) [hereinafter "Carlyle LP 2019 Form 10-K"].

[6] LPA at 2 (defining "Board of Directors" as "the Board of Directors of [Carlyle Management]").

[7] Am. Compl. ¶¶ 16, 18; Henry Aff., Ex. 1 at 202.

[8] Am. Compl. ¶ 3; Henry Aff., Ex. 1 at 202.

[9] Carlyle LP 2019 Form 10-K at 249.

### 1. Up-C IPOs Generally

An LLC or partnership can go public through several structures. Under a more traditional method, "a new corporation . . . is formed to be the vehicle taken public[, and] . . . the legacy owners of the LLC would contribute their LLC interests to the [new corporation] in exchange for stock of [the new corporation]."[10] The new corporation then "sell[s] shares to the public for cash."[11] The legacy owners pay no tax on the exchange, and the corporation does not receive a stepped up basis in the LLC's or partnership's assets.[12]

An alternative structure known as an up-C allows the enterprise to reduce its future tax liability at no cost to the public investors. Under that structure, a new corporation is formed and the LLC or partnership continues as the operating entity.[13] The corporation sells shares to the public through an IPO and the corporation may then use the IPO cash to purchase equity in the LLC or partnership, a portion of which can come directly from the legacy owners.[14] As a result, the corporation becomes a holding company that conducts its operations through the original LLC

---

[10] Gregg D. Polsky & Adam H. Rosenzweig, *The Up-C Revolution*, 71 Tax L. Rev. 415, 427 (2018) [hereinafter "Polsky & Rosenzweig"].

[11] *Id.*

[12] *Id.*

[13] *Id.* at 435.

[14] *Id.*

or partnership.[15] The legacy owners continue to own the operating company equity they did not sell to the corporation.[16]

The operating company units are generally illiquid, but the legacy owners can exchange them for the publicly traded corporate stock.[17] Those exchanges are taxable, which has three relevant implications: (1) the corporation receives a stepped-up basis in the allocable portion of the LLC or partnership assets;[18] (2) the allocable portion of the LLC's or partnership's self-developed goodwill becomes depreciable;[19] and (3) the legacy owners pay taxes in connection with the exchange.[20] The stepped-up basis and depreciable goodwill allow the corporation to reduce its future taxable income, which benefits the public stockholders.[21] Often, the legacy owners will share in any tax savings by entering into a tax receivable agreement, or

---

[15] *See id.*; Gladriel Shobe, *Private Benefits in Public Offerings: Tax Receivable Agreements in IPOs*, 71 Vand. L. Rev. 889, 926 (2018) [hereinafter "Shobe, *Private Benefits*"] (explaining that an up-C IPO creates "a structure where the public company is essentially a holding corporation for the operating partnership").

[16] Polsky & Rosenzweig at 435–36.

[17] *Id.* at 435–36, 438–39.

[18] *Id.* at 416; *see also* Shobe, *Private Benefits* at 926 ("Part of the 'magic' of [the up-C] structure is that when the public company purchases interests in the partnership (with the money it receives in the IPO), the corporation gets a stepped-up basis in the partnership's assets, thus creating valuable tax assets.").

[19] Gladriel Shobe, *Supercharged IPOs and the Up-C*, 88 U. Colo. L. Rev. 913, 929 (2017).

[20] Polsky & Rosenzweig at 436, 440.

[21] *Id.* at 440.

TRA.[22]    Those agreements typically entitle the legacy owners to payments representing 85% of the realized tax savings while the corporation enjoys the remaining 15%.[23]

### 2. Carlyle LP's Pre-IPO Structure

Carlyle LP was formed in July of 2011.[24]   Before its IPO, Carlyle LP was generally structured like an up-C, except its public investors held equity in a publicly traded partnership rather than a corporation.  At all relevant times, Carlyle LP had "no material business operations of its own."[25]   Instead, it held interests in three intermediate holding companies:   defendant Carlyle Holdings I GP Inc. ("Intermediate Holdco I"), defendant Carlyle Holdings II GP LLC ("Intermediate Holdco II"), and Carlyle Holdings III GP LP ("Intermediate Holdco III").[26] Intermediate Holdco I held an interest in Carlyle Holdings I LP ("Holdco Sub I"); Intermediate Holdco II held an interest in Carlyle Holdings II LP ("Holdco Sub II"); and Intermediate Holdco III held an interest in Carlyle Holdings III LP (together with Holdco Sub I and Holdco Sub II, the "Subsidiary Holdcos" and each an

---

[22] *Id.* at 448; *see also* Victor Fleischer & Nancy Staudt, *The Supercharged IPO*, 67 Vand. L. Rev. 307, 320–21 (2014).

[23] Polsky & Rosenzweig at 437.

[24] The Carlyle Group LP, Form 10-Q (Quarterly Report), at 8 (May 22, 2012).

[25] Am. Compl. ¶ 48.

[26] Henry Aff., Ex 1 at 12.

"Subsidiary Holdco").[27]  Carlyle LP's material business operations were carried out through entities indirectly owned by the Subsidiary Holdcos.

### 3. Carlyle LP's IPO

In 2012, Carlyle LP conducted an IPO using a publicly traded partnership structure.  After the IPO, public unitholders held Carlyle LP partnership units.  But the three Subsidiary Holdcos remained private companies, and the Private Unitholders held Subsidiary Holdco units.  Carlyle LP's 2012 post-IPO ownership structure appears below:[28]

---

[27] *Id.*

[28] *Id.*  A FAQ distributed by Carlyle LP described its partnership structure as "byzantine." Foulds Aff., Ex. 3 at -1653.



To sell their equity, the Private Unitholders first had to exchange their units in the Subsidiary Holdcos for publicly traded Carlyle LP units pursuant to an exchange agreement.[29] The exchange agreement provided the Private Unitholders would receive one publicly traded unit in exchange for one unit of each of the three

---

[29] Henry Aff., Ex. 1 at 12.

Subsidiary Holdcos.[30] This opinion refers to one unit of each of the three Subsidiary Holdcos together as a "Subsidiary Holdco Unit." The agreement required that these exchanges be taxable to the Private Unitholders.[31]

Because the exchanges were taxable, the Private Unitholders would incur a tax liability in connection with any exchange. These taxes could be significant as the Private Unitholders generally had a near-$0 basis in the Subsidiary Holdco Units.[32] The exchanges afforded a Carlyle LP subsidiary a stepped-up basis and turned the allocable portion of the partnership's non-depreciable, self-developed goodwill into depreciable goodwill, which could reduce the Carlyle enterprise's future taxable income.

Carlyle LP, the Founders, and others entered into the TRA to allow the Private Unitholders to share in Carlyle LP's tax savings.[33] The TRA provided that the Private Unitholders would be paid an amount equivalent to 85% of Carlyle LP's tax

---

[30] The Carlyle Group LP, Form 8-K (Current Report) (May 8, 2012), Ex. 10.1 § 2.1.

[31] *Id.* § 3.11; Am. Compl. ¶ 51.

[32] Foulds Aff., Ex. 3 at -1654 to -1655.

[33] Henry Aff., Ex. 34 [hereinafter "TRA"]. This opinion proceeds on the understanding that all the Private Unitholders held TRA rights and eventually received payments in connection with the challenged transactions, even though the record before the Court does not speak to that understanding, and indeed does not indicate whether all the Private Unitholders entered into the TRA.

11

savings generated from the exchange of their Subsidiary Holdco Units.[34] The Private Unitholders would not receive any payments unless and until Carlyle LP realized those tax savings.[35] Whether and to what extent Carlyle LP would realize any tax savings was uncertain and dependent on multiple factors, including the applicable tax rate and whether Carlyle LP realized taxable income in a given year.[36] The payments would be made over a minimum of fifteen years,[37] but it could take twenty "years or perhaps even longer" for all payments to be made.[38] Defendants Buser, Peter Clare, Conway, D'Aniello, Ferguson, Christopher Finn, James Hance, Jr., Rubenstein, and Youngkin (the "Private Unitholder Defendants") all held Subsidiary Holdco Units subject to the TRA.

Carlyle LP made no TRA payments before 2016, and a total of $6.5 million in TRA payments from 2016 through 2020.[39] Two facts contributed to the minimal

---

[34] *Id.* §§ 3.01(a)–(b). The TRA provided that the tax savings and payments could be calculated based on the savings of different Carlyle LP subsidiaries that are "treated as a domestic corporation for United States federal income tax purposes," and that the payments could come from any of those entities. *Id.* § 3.01(a); *id.* at 3. For purposes of clarity, this decision references only Carlyle LP when discussing the tax savings as relevant to the TRA or any payments made pursuant to the TRA.

[35] *Id.* §§ 3.01(a)–(b); *see* Am. Compl. ¶ 65.

[36] *See* Foulds Aff., Ex. 1 at -3032; Foulds Aff., Ex. 3 at -1655 to -1656; Carlyle LP 2019 Form 10-K at 79.

[37] Foulds Aff., Ex. 2 at -2648; Foulds Aff., Ex. 3 at -1655 ("[T]he normal TRA payments are made over 15+ years.").

[38] Foulds Aff., Ex. 3 at -1656.

[39] Am. Compl. ¶¶ 68–69.

nature of these payments. First, the Private Unitholder Defendants, who owned a significant portion of the units subject to the TRA, undertook few exchanges. Rubenstein never exchanged any Subsidiary Holdco Units. D'Aniello and Conway each exchanged only 2.5 million of their 47 million units, "meaning that they had retained 95% of their original" Subsidiary Holdco Units.[40] The rest of the Private Unitholder Defendants undertook "almost no taxable exchanges since [Carlyle LP's] IPO in 2012."[41] Together, the Private Unitholder Defendants accounted for only about $1.6 million of the TRA payments. Second, these exchanges yielded little value because during those years Carlyle LP "suffered significant investment losses and operating losses for tax purposes and therefore [did] not ha[ve] sufficient taxable income."[42]

Plaintiff offers further explanations for the Private Unitholder Defendants' lack of exchanges. It alleges they were "billionaires with no need to engage in taxable exchanges" because "they could donate to charity tax free or simply hold their units until death, at which point they would avoid ever having to pay taxes on their gain because their future heirs would get a stepped-up basis in those units under the tax code."[43] Rubenstein, who was "almost 73" when the operative complaint

---

[40] *Id.* ¶ 68.

[41] *Id.* ¶ 67.

[42] Foulds Aff., Ex. 3 at -1656.

[43] Am. Compl. ¶ 71.

13

was filed, signed the "'Giving Pledge' in 2010 and stated that he had 'already made arrangements to ensure that a good deal more than half of [his] resources would have gone to philanthropic purposes.'"[44] D'Aniello similarly "committed to donate over half of [his] wealth, which largely consists of Carlyle stock."[45]

Carlyle LP could terminate the TRA at any time.[46] If it did so, the Private Unitholders would be entitled to an early termination payment.[47] The payment amount was not fixed, but it was substantial: a Carlyle LP advisor estimated it to be $551 million in 2019.[48] The termination payment did not necessarily represent the fair value of the TRA rights.[49] As a company presentation described, "Early termination is meant to be an anti-takeover equivalent to eliminating [the] TRA, not necessarily determinative of fair market value."[50]

In short, two events relevant here would trigger payments to the Private Unitholders under the TRA: (1) if the Private Unitholders exchange their Subsidiary

---

[44] *Id.* ¶ 83 n.29 (citation omitted).

[45] *Id.* ¶ 83 (footnote omitted).

[46] TRA § 4.01(a).

[47] *Id.*

[48] Henry Aff., Ex. 5 at -0105.

[49] Foulds Aff., Ex. 1 at -3032 ("[T]he fair value of future exchanges is likely meaningfully lower than the early termination clause suggests . . . .").

[50] Foulds Aff., Ex. 2 at -2653; *see also* Am. Compl. ¶ 85.

14

Holdco Units for publicly traded units, and Carlyle LP generates resulting tax savings; or (2) if Carlyle LP terminates the TRA.

### B.     The Limited Partnership Agreement

Carlyle LP was governed by a limited partnership agreement (the "LPA"). The LPA eliminated all fiduciary duties.[51]  It permitted Carlyle LP to "transfer assets to . . . business entities in which it is or thereby becomes a participant on terms to which [Carlyle Management] agree[d] in good faith."[52]  Similarly, it permitted Carlyle Management and its affiliates to "sell, transfer or convey any property to, or purchase any property from, [Carlyle LP], directly or indirectly, on terms to which [Carlyle Management] agree[d] in good faith."[53]

Under the LPA, Carlyle Management was entitled to a conclusive presumption that it acted or chose not to act in good faith so long as Carlyle Management did not subjectively believe its "determination, action or failure to act was opposed to the best interests of [Carlyle LP]," or if its act or failure to act received "Special Approval."[54]  The agreement defines Special Approval as approval by either Carlyle LP's conflicts committee (the "Conflicts Committee") or a majority

---

[51] LPA § 7.9(a).

[52] *Id.* § 7.6(d).

[53] *Id.* § 7.6(e).

[54] *Id.* § 7.9(a).  The presumption also applied to decisions made by the Board or any Board committee.

of Carlyle LP's outstanding voting units, excluding units held by Carlyle Management and its affiliates.[55] Carlyle Management was also entitled to a conclusive good faith presumption if it consulted with an advisor, so long as it selected the advisor, relied on the advisor's advice, and believed the matter in question was within the advisor's expertise.[56]

### C.    Project Phoenix

Carlyle LP's stock price was not performing as hoped and the company began considering acting to address the underlying causes and other related issues.[57] That endeavor was known as "Project Phoenix." As part of Project Phoenix, the Board met in July of 2018 and discussed the possibility of converting Carlyle LP to a publicly traded corporation (the "Conversion").[58] Carlyle LP retained Centerview Partners LLC as a financial advisor to assist with the Conversion and other initiatives.[59] An entity by the name of Carlyle Investment Management LLC retained Ernst & Young LLP ("E&Y") to advise on the tax implications of Carlyle

---

[55] *Id.* at 8 (defining "Special Approval").

[56] *Id.* § 7.10(b).

[57] Henry Aff., Ex. 13 at -0018.

[58] Henry Aff., Ex. 7 at -1476.

[59] Henry Aff., Ex. 8 at -0011 to -0012 (engagement letter defining the scope of work as, among other things, to "[a]dvise and assist [Carlyle LP] in evaluating its capital structure and shareholder return alternatives," and to "[a]dvise and assist [Carlyle LP] in evaluating shareholder value and ownership consequences related to changing its corporate structure").

LP "converting its parent entity to a C-corporation and possible similar alternatives."[60] A group comprising Youngkin, Buser, Ferguson, Finn, Carlyle LP co-CEO Kewsong Lee, and three other Carlyle LP employees (the "Conversion Working Group") was tasked with evaluating the Project Phoenix initiatives, including the Conversion.[61] Youngkin, Buser, Ferguson, and Finn were all Private Unitholders with TRA rights.

The Conversion would foreclose future TRA payments for unexchanged Subsidiary Holdco Units but would not terminate the TRA or otherwise trigger an early termination payment.[62] The Conversion Working Group nevertheless considered a payment to the Private Unitholders alongside the Conversion (the "TRA Buyout"), and such a payment became part of Project Phoenix. It is unclear what prompted the Conversion Working Group to consider such a payment, but the

---

[60] Henry Aff., Ex. 9 at -0031.

[61] Am. Compl. ¶ 74.

[62] Foulds Aff., Ex. 3 at -1654 ("The TRA cannot be maintained in a tax-free conversion to a Full-C structure because of the absence of a taxable exchange."); *id.* at -1657 ("The Full-C conversion transaction . . . does not breach the TRA, nor would the conversion technically terminate the TRA. Instead, the conversion is a series of tax-free mergers that simply makes the TRA irrelevant. As consideration to the Carlyle Partners, we voluntarily are modifying the TRA to provide for a payment in lieu of the normal TRA payments."). A conversion would not affect existing TRA liabilities relating to past exchanges. *Id.* at -1652 to -1653; Henry Aff., Ex. 5 at -0155.

defendants assert it followed "a 'lengthy assessment and negotiation process' with the Founders, who had voting control over the partnership."[63]

### 1. The September 28 Conversion Working Group Meeting

The Conversion Working Group first met to discuss Project Phoenix on September 28.[64] Centerview presented a slide deck comparing three structures: (1) remaining a publicly traded partnership; (2) an up-C structure, in which Carlyle LP would convert to a publicly traded corporation that would conduct its operations through the Subsidiary Holdcos, with the Private Unitholders continuing to hold equity directly in the Subsidiary Holdcos; and (3) the Conversion, which entailed converting to a publicly traded "Full-C corporation" that would wholly own the three Subsidiary Holdcos, with all investors holding equity only in the public corporation.[65] The Conversion scored the most favorably across several categories, followed by the up-C, and then the publicly traded partnership structure.[66]

Centerview recommended the Conversion as the best option for both public investors and the Private Unitholders.[67] One slide included three positive

---

[63] D.I. 23 at 9 (citation omitted).

[64] Foulds Aff., Ex. 1. To be sure, the presentation shown at the September 28 meeting is titled "Board Discussion Materials." *Id.* at -0317. The operative complaint alleges this presentation was instead presented to the Conversion Working Group, and the defendants have offered nothing to dislodge those well-pled allegations. Am. Compl. ¶¶ 74–75.

[65] Foulds Aff., Ex. 1 at -3038; *see also id.* at -3040 (comparing governance structures).

[66] *Id.* at -3038.

[67] *Id.* at -3019, -3029.

consequences of a Conversion specifically for the Private Unitholders, which were listed as "Current Cash Income," "Valuation uplift," and "Increased liquidity."[68] The Conversion carried only two disadvantages: relatively less governance flexibility and the practical elimination of the TRA rights.[69] Centerview noted the latter was a concern for only the Private Unitholders,[70] and observed that "[i]n [a] conversion to a Full-C corporation, the TRA . . . may be extinguished without triggering [an] early termination payment."[71]

Centerview also discussed potential payments to the Private Unitholders if Carlyle LP terminated the TRA outside of the Conversion.[72] It explained that "[i]f [the] TRA is terminated early, provisions under [the] existing TRA call for payments of ~$600mm based on the present value of all tax benefit payments," and that "[g]iven significant uncertainties on the value of the TRA . . . the fair value of future exchanges is likely meaningfully lower than the early termination clause suggests."[73] Centerview estimated the present value of the TRA rights "to be <$150mm ($0.70 / eligible private unitholder)."[74] The relevant slide was marked "DRAFT

---

[68] *Id.* at -3038.

[69] *Id.*; *see also id.* at -3040 (discussing governance across structures).

[70] *Id.* at -3038.

[71] *Id.* at -3032.

[72] *Id.*

[73] *Id.*

[74] *Id.*

19

PRELIMINARY ANALYSIS."[75]   Centerview did not conduct a subsequent valuation.

### 2.   The March 2019 Working Group Meeting

In March 2019, the Conversion Working Group received a presentation focused on the TRA.[76]  It noted there were 234 million units subject to the TRA and generally discussed the TRA's terms.[77]  It explained that the minimum TRA payment period is "roughly 15 years from the time of each exchange," but that the actual payout period "[w]ill likely be significantly longer based on corporate usage."[78]

The presentation analyzed the TRA rights under the current partnership structure, an up-C structure, and the Conversion.[79]  It explained that remaining a publicly traded partnership would not affect the TRA rights and that an up-C transaction would leave the TRA in place but increase its value to the Private Unitholders.[80]  As to the Conversion, the presentation explained:  "A tax free conversion to a full C effectively terminates the TRA as there is no taxable exchange to trigger the basis step up," but that "[a] taxable conversion would trigger the TRA,

---

[75] *Id.*

[76] Foulds Aff., Ex. 2.  Plaintiff is silent as to who presented the March 2019 slide deck.

[77] *Id.* at -2648.

[78] *Id.*

[79] *Id.* at -2649.

[80] *Id.*

but [a] huge tax liability would be due."[81]  The presentation conveyed that the TRA would not be terminated in connection the Conversion.[82]

The presentation also analyzed the TRA rights' value in sixty different scenarios with values ranging from $0.14 to $4.02 per unit.[83]  The vast majority of those valuations assumed exchanges of between 6.5 million units and 15 million units each year.[84]  Three of the valuation slides discussed early termination payments, all of which noted that the Conversion would not require a termination payment.[85]  The Conversion Working Group also received information on the volume of exchanges from the second quarter of 2017 through the first quarter of 2019, which showed the Private Unitholders exchanged an annualized average of 5.2 million Subsidiary Holdco Units during that time.[86]  The slide did not disclose the TRA payments made pursuant to those exchanges.

---

[81] *Id.*; *see also id.* at -2654 (explaining "Value to the TRA would be **zero** in the following circumstances . . . [t]ax free conversion of units to C corporation").

[82] *Id.* at -2658 ("No termination payment required in Full-C conversion or potentially certain changes of control."); *id.* at -2659 (same); *id.* at -2660 (same); *see also id.* at -2649 ("A tax free conversion to a full C *effectively* terminates the TRA as there is no taxable exchange to trigger the basis step up." (emphasis added)).

[83] *Id.* at -2653 to -2672.

[84] *Id.* at -2655.  Nine valuations assume the exchange of 78 million units over three years. *Id.*

[85] *Id.* at -2658 to -2660.

[86] *Id.* at -2673.

Those valuations were prefaced by the comment that the "[v]alue of the TRA would be **zero** in the following circumstances," including a "[t]ax free conversion of units to [a] C corporation."[87] It noted three other circumstances in which the TRA rights would be worthless: (1) if the Private Unitholders "[n]ever exchanged private units and died with units in [their] estate"; (2) if the Private Unitholders "[g]ifted private units to charity"; and (3) if Carlyle LP never realized a benefit from the stepped up basis following an exchange, including due to a change in tax rules or if it "had losses in perpetuity."[88]

### 3. The April 2019 Board Meeting

The Board first met to discuss Project Phoenix in April 2019.[89] Ferguson and Buser gave a presentation that reiterated some of the reasons for undertaking Project Phoenix, including that Carlyle LP's "stock ha[d] not performed," was "trading below the IPO price[,] . . . and trade[d] at the lowest valuation multiple in [its] peer set."[90] It noted the benefits of the Conversion as compared to remaining a publicly traded partnership and pursuing an up-C structure, concluding that the Conversion "tends to provide the highest after tax return to shareholders."[91]

---

[87] *Id.* at -2654 (emphasis in original).

[88] *Id.*

[89] Am. Compl. ¶ 87; Henry Aff., Ex. 13.

[90] Henry Aff., Ex. 13 at -0018 (emphasis omitted).

[91] *Id.* at -0024 (emphasis omitted).

The presentation also discussed the Private Unitholders' TRA rights. It listed a series of factors affecting the TRA rights' value, including applicable corporate tax rates.[92] The presentation explained that the TRA rights generate income only if Carlyle LP has "positive taxable income," that "historically, Carlyle [LP's] [net operating loss] position has reduced TRA payments because the additional deductions have not offset taxable income," and that a "[r]eduction of [the] corporate tax rate reduced the value of the TRA."[93] The presentation noted that the TRA rights would be unchanged if Carlyle LP remains a publicly traded partnership, that converting to an up-C would leave the TRA in place but increase its value, and that the Conversion would "effectively terminate[] the TRA as there is no taxable exchange to trigger the basis step up."[94] The presentation included a valuation of the TRA rights based on "roughly 60 different alternatives" and concluded "[e]valuating various sensitivities" showed the TRA rights had a net present value "from zero to $4.00 per unit."[95] Those valuations appear identical to those presented to the Conversion Working Group at its March 2019 meeting, and assumed the same volume of exchanges.[96]

---

[92] *Id.* at -0039.

[93] *Id.* at -0037.

[94] *Id.* at -0038.

[95] *Id.* at -0041 (emphasis omitted).

[96] *Compare* Foulds Aff., Ex. 2 at -2655 to -2657, *with* Henry Aff., Ex. 13 at -0043 to -0045.

The Board also received two other facts that had been presented to the Conversion Working Group. First, the Board learned that the TRA "[p]ayout period is roughly a minimum of 15 years from the time of each exchange," and that it "[w]ill likely be significantly longer based on corporate taxable income and usage of related deduction[s]."[97] Second, the presentation stated the TRA rights would be worth nothing if the Conversion were tax free or if the company did not receive a tax benefit on a stepped-up exchange.[98]

Unlike the Conversion Working Group, the Board was not presented with the volume of past exchanges. In fact, a slide comparing precedent TRA transactions to Carlyle LP's TRA included no information on Carlyle LP's payments for historical exchanges despite giving that information for the three precedent transactions.[99] The presentation also omitted any reference to the value of the TRA rights if the rightholders died before exchanging units or donated the units to charity.

### D. The Conflicts Committee Evaluates The Conversion And TRA Buyout.

Carlyle LP continued to move forward with the Conversion and TRA Buyout. The transactions were evaluated by Carlyle LP's standing Conflicts Committee, which comprised Carlyle LP directors Lawton Fitt, Janet Hill, Dr. Thomas

---

[97] Henry Aff., Ex. 13 at -0037.

[98] *Id.* at -0042.

[99] *Id.* at -0046.

Robertson, William Shaw, and Anthony Welters. Before the Conflicts Committee's first meeting, Fitt retained Perella Weinberg Partners LP to serve as the committee's financial advisor. The Conflicts Committee retained the law firm Gibson, Dunn & Crutcher LLP to serve as its legal counsel.

### 1. July 15 Conflicts Committee Meeting

The Conflicts Committee met to discuss Project Phoenix for the first time on July 15, 2019.[100] Buser attended in his capacity as Carlyle LP's CFO, as did representatives from Perella Weinberg, Gibson Dunn, and Carlyle LP advisors Centerview and Simpson, Thacher & Bartlett LLP.[101] Buser explained that "[Carlyle LP's] proposal was the product of extended negotiations between [Carlyle LP] and its founders, and [Carlyle LP] viewed the proposal as offering the best prospects for future value creation for [Carlyle LP's] public unitholders."[102] The parties offered nothing as to what prompted the negotiations, when they took place, or who negotiated with the Founders.[103]

---

[100] Henry Aff., Ex. 14.

[101] *Id.* at -0008.

[102] *Id.*; *see also* Henry Aff., Ex. 5 at -0089 (noting that the Conversion and TRA Buyout "follow[ed] extensive discussions [between Carlyle LP] and its Founders").

[103] The operative complaint advances the theory that the Private Unitholder Defendants demanded a payment in exchange for the loss of their TRA rights. *See, e.g.*, Am. Compl. ¶ 6 ("The [Private Unitholder Defendants] nevertheless proposed that [Carlyle LP] pay them $344 million for their worthless TRA rights."). I understand the complaint to allege that the Founders negotiated and obtained payments on behalf of the Private Unitholder Defendants.

Buser presented to the committee.[104] The presentation explained Carlyle LP was proposing to convert to a corporation, and that the Conversion would create more value for all unitholders than remaining a partnership or pursuing an up-C conversion.[105] The presentation noted the Conversion would be tax free only in the appendix.[106]

Unlike the September 2018 and March 2019 presentations given to the Conversion Working Group, the July 15 Conflicts Committee presentation indicated the TRA would be terminated. Multiple slides stated Carlyle LP was terminating the TRA in connection with the Conversion.[107] The presentation stated that "terminat[ing]" the TRA would "improv[e] transparency and further align[] former private unitholders with public shareholders."[108] The presentation explained that if

---

[104] Henry Aff., Ex. 14 at -0008; Henry Aff., Ex. 5.

[105] Henry Aff., Ex. 5 at -0088 (emphasis omitted).

[106] *Id.* at -0128.

[107] *Id.* at -0089 ("As part of our conversion, we intend to terminate the TRA for all unexchanged private units."); *id.* at -0093 ("TRA for all unexchanged private units will be terminated . . . ."); *id.* at -0104 ("As part of the proposed conversion transaction, Carlyle will terminate the TRA in respect to all unexchanged private units."); *id.* ("By terminating the TRA we will further align shareholder economics and simplify administrative and reporting complexity and associated costs."); *see also id.* at -0159 (explaining that eliminating the TRA obligation as to future exchanges "[r]equires payment of upfront consideration to TRA holders").

[108] *Id.* at -0093.

26

the TRA was "directly terminated by Carlyle [LP], Carlyle [LP] would be obligated to pay an early termination payment of $551 [million]."[109]

The presentation presented the termination payment as a "[l]ens" through which to assess the TRA Buyout payment.[110] The presentation explained that the "[h]olders of TRA [rights] on unexchanged private units [would] receive compensation of $1.50 / private unit paid over 5 years,"[111] or a total payment of about $338 million.[112] That valuation was supported by a sensitivity analysis that assumed the exchange of between 3 million and 12 million Subsidiary Holdco Units annually.[113] The presentation also stated that the proposed TRA Buyout payment was lower than what "would be realized by the TRA-recipients in a [publicly traded partnership] or Up-C through the TRA payments,"[114] and that the "TRA payment [was] set within [the] range of TRA scenarios analyzed by Carlyle [LP]."[115] The presentation omitted that the TRA rights were worthless if the rightholders died without exchanging Subsidiary Holdco Units or if they donated the units to charity.

---

[109] *Id.* at -0105.

[110] *Id.*

[111] *Id.* at -0089.

[112] *Id.* at -0104.

[113] *Id.* at -0106.

[114] *Id.* at -0104.

[115] *Id.* at -0093.

27

It did not discuss past exchanges undertaken by the Private Unitholder Defendants or all Private Unitholders.

The Conflicts Committee then met in an executive session "and the representatives of [Carlyle LP], Centerview and Simpson Thacher left the meeting."[116] Perella Weinberg presented to the committee during that executive session.[117] It showed slides setting the TRA rights' present value between $0.39 and $3.95 if Carlyle LP remained a publicly traded partnership and between $0.71 and $6.85 if Carlyle LP undertook an up-C conversion.[118] Those valuations assumed the Private Unitholders would exchange 6.5 million Subsidiary Holdco Units each year.[119] The valuations were based on "Project Phoenix Company projections."[120]

### 2. July 17 Conflicts Committee Meeting

The Conflicts Committee met again on July 17 and received more detailed versions of Perella Weinberg's July 15 materials.[121] Perella Weinberg explained that Carlyle LP would pay $1.50 per unit subject to the TRA, or a total of $338 million "for [the] value of TRA payments attributable to remaining future exchanges."[122] It

---

[116] Henry Aff., Ex. 14 at -0008.

[117] Henry Aff., Ex. 5 at -0151 to -0165.

[118] *Id.* at -0162.

[119] *Id.*

[120] *Id.*

[121] Henry Aff., Ex. 15 at -0010 to -0011; Henry Aff., Ex. 16.

[122] Henry Aff., Ex. 16 at -0171.

28

noted that the TRA Buyout "crystalizes long-term, uncertain payments as [a] near-term, known liability."[123] It also stated the Conversion benefitted the company by "eliminat[ing]" the TRA obligation, but that doing so "[r]equire[d] payment of upfront consideration to TRA holders."[124] Perella Weinberg further explained that the TRA Buyout payment "compare[d] favorably to [the] latest disclosed termination liability of $458M," which was the estimated termination payment as of December 31, 2018.[125] The same slide compared the TRA payment to the more recent $551 million termination payment estimate.[126] The presentation included valuations of the TRA rights similar to those presented on July 15, which again assumed the exchange of 6.5 million units annually.[127]

The presentation omitted that the Private Unitholders would not be entitled to future TRA payments following the Conversion, did not give information on past exchanges, and did not explain why Carlyle LP was making any payment at all to the TRA rightholders in connection with the Conversion.

The Board met to discuss the Conversion on July 24. It received the same presentation the Conflicts Committee received on July 15.

---

[123] *Id.* at -0173.

[124] *Id.* at -0176.

[125] *Id.* at -0177.

[126] *Id.*

[127] *Id.* at -0185.

### 3. July 29 Conflicts Committee Meeting

The Conflicts Committee met again on July 29.[128]  Its members discussed the Conversion and several related matters, including that certain unitholders would grant an irrevocable proxy to Carlyle Management in connection with the Conversion that would give Carlyle Management control over a majority of post-Conversion entity's voting power.[129]  The proxy would expire upon the earlier of Carlyle Management owning less than 20% of the post-Conversion entity's voting power or January 1, 2025.[130]  "The [Conflicts] Committee discussed that, under the proposed structure, there would be a clear path to the founders and management no longer controlling the [post-Conversion entity]."[131]

### E.    The Conflicts Committee, Board, And Transaction Committee Approve The Conversion And TRA Buyout.

The Conflicts Committee met a fourth and final time on July 30.  Perella Weinberg presented substantially the same slides it showed the committee on July 17.[132]  The Conflicts Committee resolved to approve the Conversion and related transactions and recommend that the Board approve the same.[133]    The

---

[128] Henry Aff., Ex. 27.

[129] *Id.* at -2645; Henry Aff., Ex. 26 at -0189.

[130] Carlyle Group LP, Form 8-K (Current Report), at 3 (Jan. 2, 2020).

[131] Henry Aff., Ex. 27 at -2645.

[132] Henry Aff., Ex. 17.

[133] Henry Aff., Ex. 18 at -0243.

post-Conversion entity would be known as The Carlyle Group Inc. ("Carlyle Inc.").[134]

The Conflicts Committee approved certain TRA arrangements that introduced a new wrinkle. An exhibit to the resolutions explained that as part of the Conversion, the Private Unitholders would "exchange [Subsidiary Holdco Units] for an equivalent number of shares of common stock in [the future corporation] and the entitlement to" payments totaling $1.50 per "[Subsidiary Holdco Unit] exchanged[,] . . . payable in five equal annual installments."[135] The exhibit hedged that "the specific transactions . . . may be more complicated and/or take a different specific legal form."[136] The resolution was silent as why the TRA Buyout called for a unit transfer if the payments were intended to compensate for the Conversion's effective elimination of the Private Unitholders' TRA rights.

The Board met the same day and resolved that the Conversion and related transactions were "advisable and in the best interests of [Carlyle LP]."[137] The Board also resolved to create a transaction committee (the "Transaction Committee") and authorized it to "act on behalf of the Board with all of the power and authority of the full Board" and to "determine in its sole discretion to be necessary, advisable or

---

[134] Henry Aff., Ex. 26 at Ex. A at preamble [hereinafter "Plan of Conver."].

[135] *Id.* at Ex. B (footnote omitted).

[136] *Id.* at n.1.

[137] Henry Aff., Ex. 20 at -2634.

31

appropriate in connection with the [Conversion and related transactions]."[138] This included "the power and authority to make a final determination whether to proceed with the [Conversion and related transactions] and to approve the [Conversion and related transactions]."[139] The Transaction Committee comprised D'Aniello, Fitt, Lee, and Youngkin.[140] Consistent with previous Board and Conflicts Committee materials, the relevant Board minutes did not mention the reason for the TRA Buyout.

The Transaction Committee resolved to approve the Conversion and related transactions on December 13.[141] It passed resolutions authorizing "each officer and director of" Carlyle Management and Carlyle Inc. to "perform all such agreements, contracts, subcontracts, obligations, binding understandings, . . . promises, arrangements, . . . legally binding commitments or undertakings of any nature (whether written or oral and whether express or implied), in connection with the [Conversion and related transactions] as any such [person] shall determine necessary, desirable or appropriate."[142] It also resolved to approve Carlyle Inc.'s certificate of conversion and certificate of incorporation, as well as a master

---

[138] *Id.*

[139] *Id.*

[140] *Id.* at -2635.

[141] Henry Aff., Ex. 26.

[142] *Id.* at -0199 to -0200.

reorganization agreement (the "MRA") and a plan of conversion (the "Plan of Conversion").[143] And it passed a resolution authorizing the issuance of Carlyle Inc. common stock "as provided in the Plan of Conversion, the [MRA], [all ancillary documents], and the related agreements."[144] Carlyle Inc.'s certificate of incorporation set the par value of its stock at $0.01.[145] The Transaction Committee further resolved to amend the TRA: the TRA was not terminated in connection with the Conversion.[146] Finally, the resolutions provided that the Transaction Committee's resolutions "shall have the effect, . . . after the effectiveness of the Conversion, of [Carlyle Inc.'s] Board taking them on behalf of [Carlyle Inc.]."[147]

### F. The Transaction Documents

The Plan of Conversion set forth the Conversion's mechanics. It provided Carlyle LP would convert to a corporation on January 1, 2020.[148] Specified types of Carlyle LP partnership units outstanding immediately before the Conversion would be converted into one share of Carlyle Inc. common stock.[149] The post-conversion board would comprise Conway, D'Aniello, Rubenstein, Lee, Youngkin, Clare, Fitt,

---

[143] *Id.* at -0189 to -0190, -0192.

[144] *Id.* at -0195.

[145] *Id.* at -0215 at art. IV, § 4.01(a)(i).

[146] *Id.* at -0190.

[147] *Id.* at -0199.

[148] Plan of Conver. § 1.01; *id.* § 1.02 (defining "Effective Time").

[149] *Id.* § 2.01(i); *see also* Henry Aff., Ex. 26 at -0216 at art. 4, § 4.01(b).

Hance, Hill, Robertson, Shaw, and Welters.[150]  Lee and Youngkin would serve as co-CEOs of Carlyle Inc., Buser would serve as CFO, Conway would serve as chief investment officer, Ferguson would serve as general counsel, and Finn would serve as COO.[151]

The Plan of Conversion did not affect the Private Unitholders' equity in the three Subsidiary Holdcos, which totaled 229 million Subsidiary Holdco Units.  The treatment of those units was instead addressed by the MRA.  Twenty-three individuals and entities were signatories to the MRA, including Clare, Carlyle Group Management, Intermediate Holdco I, an Intermediate Holdco I affiliate called Carlyle Holdings I GP Sub LLC ("Holdings I GP Sub"), and Operating Sub II.[152] Conway, Rubenstein, D'Aniello, and Youngkin signed the MRA as trustees on behalf of trusts in their name or their family's name.[153]

The MRA contemplated a four-step process.

---

[150] Plan of Conver. § 1.04(a).

[151] *Id.* § 1.04(b).

[152] Henry Aff., Ex. 26, Ex. I at -0343 to -0348 [hereinafter "MRA"].

[153] *Id.* at -0343.

**Step 1**:  On behalf of the Private Unitholders, Holdings I GP Sub and Intermediate Holdco II would transfer to Intermediate Holdco I "a number of [units] [worth $344 million], as reasonably determined by [Intermediate Holdco I] on the basis of information provided by a nationally recognized valuation firm and set forth in its books and records" (the "Initial Transfer Units").[154]  It was later determined that 26.3 million Initial Transfer Units were equal to $344 million.[155]

**Step 2**:  In exchange for the Initial Transfer Units, Intermediate Holdco I would transfer to the Private Unitholders payments totaling $344 million, to be paid out in five equal installments over five years (the "Deferred Payments").[156]  The first payment would be made on January 31, 2020, and the final payment would be made on January 31, 2024.[157]

**Step 3**:  Various Carlyle entities would transfer to Carlyle Inc. on behalf of the Private Unitholders all the Private Unitholders' Subsidiary Holdco Units other than the Initial Transfer Units (the "Remaining Units").[158]

**Step 4**:  After steps one and three were completed, Carlyle Inc. would issue to the Private Unitholders "a number of shares of [Carlyle Inc. common stock] of equivalent value" to the Remaining Units.[159]

These transactions were to be effective on January 1, 2020.[160]

No party has offered any explanation as to why the TRA Buyout payments increased from $338 million, the number Perella Weinberg suggested to the Conflicts Committee, to $344 million.  And the record is unclear as to why the TRA

---

[154] *Id.* § 3.1(b).

[155] Henry Aff., Ex. 3 at 49–50.

[156] MRA § 3.1(a).

[157] *Id.*

[158] *Id.* § 9.1(a).

[159] *Id.* § 9.1(b).

[160] *Id.* at art. III at preamble, art. VIII at preamble.

Buyout payments, ostensibly for TRA rights valued at $344 million,[161] also required

the Private Unitholders to give up $344 million worth of Subsidiary Holdco Units.[162]

On January 1, Buser authorized the American Stock Transfer & Trust

Company, LLC "to issue and to deliver, on January 2, 2020, an aggregate of

228,028,388 Common Shares [of Carlyle, Inc. stock] to the brokers indicated on the

Shareholder Schedules."[163] He explained the "228,028,388 Common Shares

represent the aggregate number of Common Shares received by the individuals or

entities listed on the Shareholder Schedules."[164] The attached shareholder schedules

were fully redacted for relevance.[165] Buser's letter specified that all units were to be

exchanged "on a one-for-one basis."[166] If the transfer occurred as Buser directed,

---

[161] *See, e.g.*, Foulds Aff., Ex. 3 at -1655 ("[W]e are electing to terminate the TRA and to pay IPO partners a termination payment of $1.50 per unit over five years to compensate for the absence of the normal TRA benefits."); Henry Aff., Ex. 22 at 17 ("[W]e thought it was appropriate to remunerate [the TRA] and get rid of it. And we've essentially put the $1.50 and that was an amount to get it to go away.").

[162] The defendants offer no explanation. Plaintiff pled that the Transaction Committee made the decision to require the unit exchange because it "knew the TRA rights were worth 'zero,' and therefore the termination of the TRA could not be consideration for a $344 million payment." Am. Compl. ¶ 9. It appears that management or the Conversion Working Group designed the exchange and presented it to the Conflicts Committee. *See* Henry Aff., Ex. 18 at Ex. B ("[I]n in connection with its consideration of the foregoing, the Conflicts Committee and its advisors *have been provided with* and have reviewed and evaluated, in addition to other information, the terms and conditions of: . . . the material terms of which are attached hereto as Exhibit B . . . ." (emphasis added)).

[163] Foulds Aff., Ex. 5 at -2578.

[164] *Id.*

[165] *Id.* at -2580 to -2583.

[166] *Id.* at -2578.

36

the Private Unitholders would have received Carlyle Inc. shares on a one-for-one basis for each of their Subsidiary Holdco Units, without any deduction for the Initial Transfer Units that were supposed to be transferred as consideration for the Deferred Payments.[167] From this, it is inferable that the Initial Transfer Units were never transferred: step one under the MRA did not happen.

Nevertheless, the first four Deferred Payments have been made. The nine Private Unitholder Defendants were to receive Deferred Payments in connection with the TRA Buyout: after all five Deferred Payments were made, Buser would receive $391,062; Clare would receive $6,916,545; Conway would receive $66,749,466; D'Aniello would receive $66,749,466; Ferguson would receive $941,724; Finn would receive $312,000; Hance would receive $377,070; Rubenstein would receive $70,499,466; and Youngkin would receive $8,506,632. The payments to these defendants represent about 64% of the $344 million in Deferred Payments.

---

[167] The defendants have not argued or even suggested the approximately 1-million-unit difference between the 229 million units held by the Private Unitholders before the transfer and the 228 million units transferred represented consideration for the Deferred Payments.

### G. This Litigation

On May 11, 2021, Plaintiff made a demand to inspect Carlyle Inc.'s books and records.[168] Plaintiff filed its original complaint in this action on July 29, 2022.[169] It filed its amended complaint on January 15, 2023 (the "Amended Complaint").[170]

At bottom, Plaintiff argues the Private Unitholders received something for nothing because Carlyle Management ensured the Conflicts Committee did not receive information that would have revealed the Private Unitholder Defendants lacked the leverage to demand a payment for their TRA rights. It is undisputed that the Conversion would not trigger a termination payment and that no Subsidiary Holdco Units could be exchanged following the Conversion. Of the three structures the Conflicts Committee considered, the Conversion offered the greatest value to public unitholders and Private Unitholders. But the Private Unitholders would give up their perceived present value of their TRA rights in connection with the Conversion. If past was prologue and the Private Unitholder Defendants expected to exchange few if any of their Subsidiary Holdco Units, then it is reasonable to infer the Private Unitholder Defendants would perceive those rights held little value. Had the Conflicts Committee known this, it would not have approved paying for TRA

---

[168] Henry Aff., Ex. 2 at recitals.

[169] D.I. 1.

[170] D.I. 15.

rights in the Conversion, because the Founders and other Private Unitholder Defendants would have no reason to block it.

Plaintiff alleges Carlyle Management, acting through other defendants, ensured the Conflicts Committee did not become aware of the facts necessary to make this determination. The parties agree that if those defendants stymied the flow of information to the committee, their actions are attributable to Carlyle Management. Plaintiff also brings a second series of claims arising out of an alleged overissuance of shares in connection with the MRA.

Plaintiff asserts nine causes of action against various combinations of Conway, D'Aniello, Rubenstein, Lee, Youngkin, Clare, Fitt, Hance, Hill's estate, Robertson, Shaw, and Welters (together, the "Director Defendants"), Buser, Ferguson, Finn, Carlyle Inc., Carlyle Management, Intermediate Holdco I, Intermediate Holdco II, and Holdings I GP Sub (together with the Director Defendants, "Defendants"). Among those counts are claims for breach of fiduciary duty, breach of the LPA, breach of the MRA, breach of Carlyle Inc.'s certificate of incorporation, tortious interference with contract, and unjust enrichment.

Defendants moved to dismiss under Court of Chancery Rules 23.1 and 12(b)(6).[171] On January 22, 2024, I denied the Rule 23.1 motion.[172] This decision

---

[171] D.I. 22.

[172] D.I. 55.

addresses Defendants' motion under Rule 12(b)(6): most of Plaintiff's claims survive.

## II. ANALYSIS

The standard governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief is well settled:

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[173]

The touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[174] This standard is "minimal"[175] and plaintiff-friendly.[176] "Indeed, it may, as a factual matter, ultimately prove impossible for Plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[177]

---

[173] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[174] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[175] *Id.* at 536.

[176] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

[177] *Cent. Mortg.*, 27 A.3d at 536.

My analysis proceeds in four parts. I first address Plaintiff's claims for breaches of express and implied LPA provisions, and tortious interference with the LPA. I conclude Plaintiff has pled all claims arising out of the LPA against all named defendants. I next address Plaintiff's claims for breach of the MRA and unjust enrichment based on the alleged overissuance of Carlyle Inc. shares. I conclude Plaintiff has pled both claims against one or more defendants. Third, I address Plaintiff's post-Conversion claims for breach of fiduciary duty against Carlyle Inc.'s directors and officers, as well as a claim against the Founders as a control group. Plaintiff adequately pled its breach of fiduciary duty claims against Carlyle Inc.'s directors and officers, but it failed to plead the existence of a control group. Finally, I conclude Plaintiff has pled a claim for violating Carlyle Inc.'s charter.

## A. The LPA Claims

I first address Plaintiff's claims concerning the LPA. Count IV alleges that Carlyle Management breached the LPA by "failing to act in good faith in connection with the Conversion, [u]nit [e]xchange, and TRA Buyout."[178] Count V alleges Carlyle Management breached the LPA's implied covenant of good faith and fair dealing by withholding information from the Conflicts Committee to ensure its

---

[178] Am. Compl. ¶ 272.

approval of the TRA Buyout.  Count VIII alleges the Private Unitholder Defendants interfered with the LPA.[179]  I conclude Plaintiff has successfully pled all claims within Counts IV, V, and VIII.

### 1.    Breach Of The LPA For Failing To Act In Good Faith

Plaintiff alleges Carlyle Management failed to act in good faith in the approval of the TRA Buyout and related transactions such that Carlyle Management violated the LPA's requirements that it agree to those transactions in good faith.  Section 7.6(d) provides that Carlyle LP "may transfer assets to joint ventures, other partnerships, corporations, limited liability companies or other business entities in which it is or thereby becomes a participant on terms to which [Carlyle Management] agrees in good faith."[180]  Section 7.6(e) provides "[Carlyle Management] or any of its Affiliates may sell, transfer or convey any property to, or purchase any property from, [Carlyle LP] directly or indirectly, on terms to which the [Carlyle Management] agrees in good faith."[181]  Plaintiff argues Carlyle Management could not have acted in good faith because it knew the TRA Buyout was not in Carlyle LP's best interests, as the TRA rights were nearly worthless to the Private Unitholder Defendants whether Carlyle LP remained a partnership, underwent an up-C

---

[179] Count VIII also alleges that these same defendants tortiously interfered with the MRA. I address those allegations separately.

[180] LPA § 7.6(d).

[181] *Id.* § 7.6(e).

transaction, or completed the Conversion. Plaintiff styles this shortcoming as Carlyle Management's breach of obligations under Sections 7.6(d) and (e) to agree to those transactions only in good faith; Defendants do not take issue with that formulation.[182]

Defendants respond by asserting that Carlyle Management enjoys a good faith presumption under the LPA's safe harbors because the Conversion and TRA Buyout were subject to Special Approval, and Carlyle Management relied on advisors in connection with those transactions. Neither safe harbor applies at the pleading stage.

### a. Special Approval

Section 7.9(a) of the LPA provides Carlyle Management with a conclusive good faith presumption in certain situations. It reads:

---

[182] D.I. 29 at Ans. Br. 59; Am. Compl. ¶¶ 272–73. The Amended Complaint also asserts that Carlyle Management's failure to secure the good faith presumption under Section 7.9(a)'s safe harbor breached that provision. Am. Compl. ¶ 274. This opinion explains Carlyle Management failed to secure that safe harbor. Plaintiff does not appear to pursue that claim in its answering brief, and I do not today tackle the question of whether failing to secure a safe harbor breaches that safe harbor.

> For all purposes of this Agreement and notwithstanding any applicable provision of law or in equity, a determination or other action or failure to act by [Carlyle Management], the Board of Directors or any committee thereof conclusively will be deemed to be made, taken or omitted to be made or taken in "good faith", and shall not be a breach of this Agreement, (i) if such determination, action or failure to act was approved by Special Approval or (ii) unless [Carlyle Management], the Board of Directors or committee thereof, as applicable, subjectively believed such determination, action or failure to act was opposed to the best interests of [Carlyle LP].[183]

This provision establishes a conclusive presumption that the relevant decisionmaker acted or decided not to act in good faith, so long as the decisionmaker did not subjectively believe its decision was against Carlyle LP's best interests. But even if the decisionmaker had such a subjective belief, the decisionmaker receives the conclusive good faith presumption under romanette (i) if the act or failure to act received Special Approval. Put differently, Special Approval is dispositive regardless of Carlyle Management's subjective belief. Relevant here, Special Approval means approval by the Conflicts Committee.[184] The LPA allocates the burden of demonstrating both bad faith and the requisite subjective belief under romanette (ii) to Plaintiff.[185]

The parties disagree whether Special Approval was effective here. There is no dispute that the Conflicts Committee unanimously approved the Conversion and

---

[183] LPA § 7.9(a).

[184] *Id.* at 8 (defining "Special Approval").

[185] *Id.* § 7.9(a).

TRA Buyout, making those transactions facially subject to Special Approval. But Plaintiff has pled the Special Approval was not effective because Carlyle Management ensured the Conflicts Committee did not receive key information.

### i. The Implied Covenant

The conclusive good faith presumption does not apply if Carlyle Management obtained Special Approval in violation of the LPA's implied protections for Carlyle LP unitholders.[186] The implied covenant of good faith and fair dealing "attaches to every contract."[187] It "is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[188] Our courts "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[189] "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the

---

[186] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367–69 (Del. 2017).

[187] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

[188] *Id.* (footnotes omitted) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[189] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

45

conditions as express terms in the agreement."[190]  Put differently, the covenant may be applied when addressing "understandings or expectations that were so fundamental that [the parties] did not need to negotiate about those expectations."[191]

The implied covenant can imply conditions to invoking a good faith safe harbor in a limited partnership agreement.[192]  In that context, our courts have concluded that undermining investor protections can cause the nonoccurrence of a condition to invoking that safe harbor.[193]  In *Dieckman v. Regency GP LP*, our Supreme Court reasoned that a good faith safe harbor was not available to a master limited partnership's general partner because the general partner undermined the safe harbor's investor protections.[194]  The transaction at issue was approved by a conflicts committee and a majority of the unaffiliated unitholders; under the relevant partnership agreement, each was sufficient to preclude the breach of contract claim at issue.[195]  But the plaintiff alleged the first safe harbor did not apply because the

---

[190] *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 459 (Del. Ch. 2023) (alteration in original) (internal quotation marks omitted) (quoting *Dieckman*, 155 A.3d at 360).

[191] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (internal quotation marks omitted) (citation omitted).

[192] *See Dieckman*, 155 A.3d at 367–69.

[193] *Id.* at 366–69.

[194] 155 A.3d 358, 369 (Del. 2017).

[195] *Id.* at 363–65.

46

committee was not independent as required by the partnership agreement.[196] He also alleged the unaffiliated unitholder vote safe harbor did not apply because the proxy for that vote falsely disclosed that an independent committee approved the transaction.[197] Our Supreme Court agreed. It reasoned that while the partnership agreement was silent as to whether the general partner "could use false or misleading statements to enable it to reach the safe harbors," such a condition was "easily implied," as "some aspects of the deal are so obvious to the participants that they never think, or see no need, to address them."[198] From this, the Supreme Court reasoned the agreement implied "a requirement that the General Partner not act to undermine the protections afforded unitholders in the safe harbor process."[199] The nonoccurrence of this condition precedent meant the general partner could not invoke the safe harbor.[200] Because the safe harbor was unavailable, the plaintiff was free to pursue claims for breaches of other provisions of the partnership

---

[196] *Id.* at 360.

[197] *Id.*

[198] *Id.* at 368 (internal quotation marks omitted) (quoting *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *16 (Del. Ch. June 12, 2014)).

[199] *Id.*

[200] *See id.* at 369.

agreement.[201]  The type of condition our Supreme Court implied is known as a constructive condition.[202]

Our courts have also concluded similar conduct can breach the implied covenant.[203]  In *Gerber v. Enterprise Products Holdings*, our Supreme Court concluded that interference with a safe harbor can constitute a breach of the implied covenant.[204]  There, a limited partnership purchased the general partner of an oil and gas master limited partnership in 2007 for $1.1 billion.[205]  In 2009, the partnership sold the same entity for about $100 million.[206]  In 2010, the limited partnership entered into a merger designed to eliminate any claims arising out of the 2007 and 2009 transactions.[207]  A financial advisor opined that the exchange ratio for the merger was fair but did not value the claims being eliminated.[208]  A limited partner

---

[201] *Id.*

[202] *See generally* 13 Richard A. Lord, *Williston on Contracts* § 38:11 (4th ed. May 2023 update) [hereinafter "*Williston on Contracts*"] (discussing express, implied, and constructive conditions).

[203] *Gerber v. Enter. Prod. Hldgs., LLC*, 67 A.3d 400, 422–23 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *13–16 (Del. Ch. Jan. 31, 2020) (reasoning frustrating minority protections in a call right provision caused nonoccurrence of implied condition to invoking the call right and resulted in a breach of the implied covenant).

[204] *Gerber*, 67 A.3d at 422–23.

[205] *Id.* at 406.

[206] *Id.*

[207] *Id.* at 407.

[208] *Id.* at 407–08.

48

sued the general partner and others alleging that the merger was unfair.[209] The limited partnership agreement included a safe harbor that precluded judicial review where the general partner relies on the advice of an advisor.[210] The general partner argued that the safe harbor applied because it relied on the financial advisor's fairness opinion in entering the 2010 merger.[211]

Though the partnership agreement was silent on the issue, the Supreme Court reasoned the parties would have agreed "that any fairness opinion contemplated by [the advisor safe harbor] would address the value of derivative claims where (as here) terminating those claims was a principal purpose of a merger."[212] The Supreme Court concluded the plaintiff "sufficiently pled that [the general partner] breached the implied covenant in the course of taking advantage of [the safe harbor's] conclusive presumption."[213]

Here, Plaintiff invokes the implied covenant both to preclude the application of the Special Approval safe harbor and as the basis for a claim for breach of an implied provision. The LPA expressly provides for one condition to invoking the conclusive good faith presumption: approval by a majority of the Conflicts

---

[209] *Id.* at 408–09.

[210] *Id.* at 410–11.

[211] *Id.* at 415.

[212] *Id.* at 423.

[213] *Id.*

Committee's members. As in *Dieckman*, the LPA's safe harbor includes a constructive condition that Carlyle Management "not act to undermine the protections afforded unitholders in the safe harbor process."[214] Consequently, the conclusive good faith presumption is impliedly conditioned on the safe harbor's protections not being undermined by the party seeking to invoke it. And following *Gerber*, if Carlyle Management undermined the Special Approval process by withholding or obfuscating information from the Conflicts Committee, Carlyle Management would breach the implied covenant. The parties made no distinction between these frameworks, and so I will evaluate them under the same analysis—if Carlyle Management materially undermined the safe harbors' protections by withholding or obfuscating information, that conduct will both cause the nonoccurrence of a constructive condition in the LPA and constitute a breach of the implied covenant.

> **(a) Carlyle Management Withheld Or Obfuscated Information From The Conflicts Committee.**

Carlyle Management withheld or obfuscated at least four facts from the Conflicts Committee.[215] First, the Conflicts Committee was not told that the TRA

---

[214] *Dieckman*, 155 A.3d at 368.

[215] Defendants do not contest that Carlyle Management knew of these facts or that it controlled the flow of information to the Conflicts Committee. Defendants concede to the extent any information was withheld from the Conflicts Committee, that information was withheld by Carlyle Management's agents and therefore any such acts or omissions are

would not be terminated in connection with the Conversion such that no termination payment would be required. Rather, the July 15 presentation to the Conflicts Committee repeatedly stated the TRA would be terminated in connection with the Conversion.[216] The presentation compared the proposed $338 million payment

attributable to Carlyle Management. D.I. 23 at 75 ("[A]s to the alleged breach of the LPA, the individual defendants' actions are all attributable to Carlyle Management. A corporation can only act through its agents."); D.I. 34 at 35 ("To be sure, Plaintiff is wrong about that presentation and its theory that Carlyle Management breached the LPA in any way. But, in all events, that presentation was made by Carlyle Management personnel on behalf of Carlyle Management in the scope of their agency." (citation omitted)).

[216] Henry Aff., Ex. 5 at -0089 ("As part of our conversion, we intend to terminate the TRA for all unexchanged private units."); *id.* at -0093 ("TRA for all unexchanged private units will be terminated . . . ."); *id.* at -0104 ("As part of the proposed conversion transaction, Carlyle will terminate the TRA in respect to all unexchanged private units."); *id.* ("By terminating the TRA we will further align shareholder economics and simplify administrative and reporting complexity and associated costs."); *see also id.* at -0105 (stating the net present value of the termination payment under the TRA was zero "[i]f" the termination payment was not required in connection with the Conversion); *id.* at -0159 (explaining that eliminating the TRA obligation as to future exchanges "[r]equires payment of upfront consideration to TRA holders").

At this stage of the proceedings, Plaintiff has pled these statements were false. The Board was repeatedly told in earlier meetings that the TRA would not be terminated. Foulds Aff., Ex. 2 at -2658 ("No termination payment required in Full-C conversion or potentially certain changes of control."); *id.* at -2659 (same); *id.* at -2660 (same); Foulds Aff., Ex. 1 at -3032 ("In conversion to a Full-C corporation, the TRA on future exchanges may be extinguished without triggering early termination payment."); *see also* Foulds Aff., Ex. 3 at -1657 ("The Full-C conversion transaction . . . does not breach the TRA, nor would the conversion technically terminate the TRA."). Defendants' opening brief appears to acknowledge that the information the Conflicts Committee received was not true at the time. D.I. 23 at 13 (citing language from the July 15 presentation stating that the TRA would be terminated in connection with the Conversion, and then stating "[b]ecause the conversion would *effectively eliminate* the TRA Holders' rights, it was considered appropriate to compensate the TRA Holders (some of whom could also prevent the conversion from taking place) for the loss of those rights . . . ." (emphasis added)). To be sure, the Conflicts Committee members received that information at those Board meetings.

51

against the termination payment and stated that if the TRA was "directly terminated by Carlyle [LP], Carlyle [LP] would be obligated to pay an early termination payment of $551 [million]."[217] The July 17 presentation likewise stated that "[e]liminat[ing the] TRA obligation "[r]equire[d] payment of upfront consideration to [the] TRA holders," and compared the TRA Buyout payment to a contractual termination payment.[218]

Second, the Conflicts Committee was not given information on the Private Unitholder Defendants' exchange history. The Private Unitholder Defendants undertook "almost no taxable exchanges since [Carlyle LP's] IPO in 2012."[219] And none of the Private Unitholder Defendants undertook a taxable exchange between February 2016 and February 2019.[220] Rubenstein did not exchange any units after the IPO, and "D'Aniello and Conway each had engaged in taxable exchanges of only 2.5 million of the 47 million units they owned at [the] IPO, meaning that they had retained 95% of their original [Subsidiary Holdco Units]."[221]

---

A plaintiff-friendly reading of the Conflicts Committee slides three months later supports the inference that Carlyle Management supplanted the directors' accurate information by then delivering inaccurate information to the Conflicts Committee.

[217] *Id.* at -0105.

[218] Henry Aff., Ex. 16 at -0176 to -0177.

[219] Am. Compl. ¶ 67.

[220] *Id.*

[221] *Id.* ¶ 68.

52

Third, the Conflicts Committee was not told that the TRA rights were worthless to the holder if Subsidiary Holdco Units were donated to charity or held until death.[222] This information was reflected in the March 2019 presentation given to the Conversion Working Group, which included no members of the Conflicts Committee.[223] That presentation contained a slide titled "Valuation alternatives," which was prefaced with a bullet point reading "[v]alue of the TRA would be **zero** in the following circumstances."[224] The April 2019 Board presentation included a similar slide titled "Valuation Considerations (cont.)," which prefaced a bulleted list with language stating that the "[v]alue to the TRA would be **zero** in the following circumstances."[225] That list did not indicate that the TRA rights were worthless if the Private Unitholders held the Subsidiary Holdco Units until death or donated them to charity.[226]

---

[222] Defendants argue the TRA rights are not "worthless" if units are donated to charity because the TRA rights are assignable with the units. D.I. 34 at 5 (citing TRA § 7.06(a)). The point is not assignability, but valuation, and what the Conversion Working Group was told. The defendants have offered no argument, much less a supported one or one I will consider at the pleading stage, as to why I should disregard the well-pled fact that the Conversion Working Group was told the TRA rights were valued at zero in the context of donating units to charity.

[223] Foulds Aff., Ex. 2 at -2654.

[224] *Id.* (emphasis in original).

[225] Henry Aff., Ex. 13 at -0042 (emphasis in original).

[226] *Compare* Foulds Aff., Ex. 2 at -2654, *with* Henry Aff., Ex. 13 at -0042.

Fourth, the Conflicts Committee was not told that "[t]he value of [the] TRA rights had declined in recent years due to reduced taxable income at the operative Carlyle entity and reduced federal corporate tax rates."[227]  This information was presented to the full Board at its April 2019 meeting.[228]

### (b) The Withheld Information Was Material To The Conflicts Committee's Decisionmaking Process.

The condition that Carlyle Management not undermine safe harbors' protections will not be satisfied if the information it withheld or obfuscated was material.  Where an agreement expressly includes a condition precedent, strict compliance with that condition is required.[229]  But where a court reads a condition into an agreement "to promote justice and prevent injustice"[230]—i.e., imposes a constructive condition—only substantial performance or substantial compliance is required.[231]  "The doctrine of substantial performance is intended to protect a party's

---

[227] D.I. 29 at Ans. Br. 62.

[228] Henry Aff., Ex. 13 at -0037.

[229] 2 E. Allen Farnsworth & Zachary Wolfe, *Farnsworth on Contracts* § 8.03, at 8-18 (4th ed. 2019) [hereinafter "*Farnsworth on Contracts*"] ("If the occurrence of a condition is required by the agreement of the parties . . . a rule of strict compliance traditionally applies."); 13 *Williston on Contracts* § 38:6 ("As a general rule . . . conditions which are either express or implied in fact must be literally met or exactly fulfilled, or no liability can arise on the promise qualified by the conditions." (footnote omitted)).

[230] 13 *Williston on Contracts* § 38:11.

[231] 8 Arthur L. Corbin et al., *Corbin on Contracts* § 32.1, at 113 (rev. ed. 2022) ("A hallmark of constructive conditions is that they must only be substantially performed.");

right to be compensated when it has performed in all material and substantive respects and to avoid the possibility of a forfeiture due to technical, minor, inadvertent, or unimportant deficiencies."[232] Withholding material information from a safe harbor's decisionmaker constitutes a failure to substantially comply with or substantially perform a constructive condition.[233] In determining whether information is material, our courts apply a standard first articulated in *TSC Industries v. Northway*:

---

*see* 13 *Williston on Contracts* § 38:12 ("[C]onstructive conditions, which arise and are implied by the courts from the language of promise contained in the parties' contract or the parties' conduct, are subject to the precept that substantial compliance with the condition . . . sufficient."); *Dieckman*, 155 A.3d at 369 (concluding a condition precedent to invoking a safe harbor did not occur where the general partner "materially" misled the unitholders in securing the requisite approval); *see also* 2 *Farnsworth on Contracts* § 8.02, at 8-9 ("[T]he rule of strict compliance is limited to express conditions."); 17B C.J.S. Contracts § 806 (Mar. 2024 update) ("[T]he doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance.").

[232] 15 *Williston on Contracts* § 44:52 (footnote omitted). The analysis of whether one has substantially performed is the inverse of the materiality analysis. Restatement (Second) of Contracts § 237 cmt. d (explaining the considerations as to whether one has substantially performed are the same as those in considering whether a failure to perform is material); *Clean Harbors, Inc. v. Union Pac. Corp.*, 2017 WL 5606953, at *4 (Del. Super. Nov. 15, 2017) ("If a party substantially performs, there is no material breach; if there is a material breach, the breaching party cannot have substantially performed."), *aff'd*, 201 A.3d 1161 (Del. 2019).

[233] *Dieckman*, 155 A.3d at 367–69.

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[234]

Here, the withheld or obfuscated information was material. The Private Unitholders had no contractual right to a payment in connection with the Conversion. Instead, Plaintiff pled that Carlyle LP was negotiating to pay the lowest price the Private Unitholder Defendants would accept in exchange for not blocking the Conversion.[235] To aid in assessing whether Carlyle LP should agree to the proposed TRA Buyout, the Conflicts Committee received valuations of the TRA

---

[234] *Kahn v. Tremont Corp.*, 1996 WL 145452, at *16 (Del. Ch. Mar. 21, 1996) (alteration in original) (internal quotation marks omitted) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976)), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[235] *See* D.I. 48 at 140 (Defendants' counsel explaining the Conflicts Committee proceeded "with the understanding that the only way to get [approval for the Conversion] was through a negotiation with the founders about what the TRA rights were worth"); D.I. 23 at 2 (stating the Board believed a TRA Buyout payment was appropriate because the Founders "had no obligation to support a transaction that required them to both forgo their contractual entitlement to payments under the tax receivable agreement and give up their control rights").

rights based on two methodologies: the value of the termination payment and an intrinsic value analysis.[236]

The Conflicts Committee was told that the Conversion would trigger a $551 million termination payment, setting a high starting point in determining whether the proposed price was fair. That analysis would look very different if no such payment was required. The repeated assertions in the July 15 Conflicts Committee presentation that a termination payment was required in connection with the Conversion were misleading and plainly material. These misrepresentations to the Conflicts Committee and the failure to inform the committee that no termination payment was required is sufficient to cause a failure of the condition that Carlyle Management not undermine the Special Approval process.

Separately, the other withheld facts were material because they demonstrated that the termination payment was not a useful benchmark. A termination payment would approximate the value of the TRA rights only if it reasonably reflected the

---

[236] Henry Aff., Ex. 5 at -0105 to -0106. The July 15 presentation also included an analysis of the tax savings Carlyle LP would realize through the Conversion and compared those figures to the proposed TRA Buyout payment. *Id.* at -0107. At this stage, I interpret this presentation to offer these tax savings as a "partial[] offset" for the "[i]mpact" of the $1.50 TRA payment rather than an alternative valuation. *Id.* at -0104. Another slide compares the proposed TRA Buyout payment to TRA buyout payments made by other companies. *Id.* at -0121. This slide appears in a section titled "Appendix: Supporting Analysis," and it is not clear to me this was presented to the Conflicts Committee or intended to be used as an alternative valuation.

value of future exchanges.[237] But the Private Unitholder Defendants would have to exchange their units to realize any value.

The withheld facts would have shown that the Private Unitholder Defendants exchanged few to no units and were not likely to exchange significantly more units in the future if Carlyle LP remained a partnership or undertook an up-C restructuring. The lack of taxable income and reduction in corporate tax rates reflect that any payments may have been minimal for the foreseeable future, and it is reasonably inferable that this could disincentivize exchanges. And in the more likely event of holding units until death or donating them, the TRA rights would have no value to the Private Unitholder Defendants. Those facts would have demonstrated that the termination payment valuation metric presented to the Conflicts Committee was of little to no use in determining the only question it needed to answer: the value of the TRA rights to the Private Unitholder Defendants. These facts were material.

In addition to the termination payment benchmark, the Conflicts Committee received intrinsic value analyses estimating the expected value of the TRA rights to the Private Unitholders.[238] The other omitted facts were material to contextualize

---

[237] Plaintiff has pled that the termination payment was not intended as an estimate of the TRA rights' value. As a presentation given to the Conversion Working Group explained, "[e]arly termination is meant to be an anti-takeover equivalent to eliminating TRA, not necessarily determinative of fair market value." Foulds Aff., Ex. 2 at -2653. The Conflicts Committee was not informed of this fact.

[238] Henry Aff., Ex. 5 at -0105 to -0106; Henry Aff., Ex. 16 at -0185 to -0186.

that valuation as well.[239]  The July 15 intrinsic value analysis valued the TRA rights at $0.06 per unit to $3.93 per unit if Carlyle LP remained a partnership.[240]  Those valuation analyses assumed the Private Unitholders would exchange between 3 million and 12 million units each year.[241]  The valuations presented by Perella Weinberg at the July 15 and July 17 meetings concluded the TRA rights had an intrinsic value of between $0.38 or $0.39 and $6.85 if Carlyle did not pursue the Conversion.[242]  They assumed the exchange of 6.5 million units each year.[243]

Notably, those analyses did not separately analyze the value of the TRA rights to the Private Unitholder Defendants as a distinct subset of the larger group.  This is relevant because the Private Unitholder Defendants' exchange history looked very different than those of the Private Unitholders.  Between the second quarter of 2017 and the first quarter of 2019, all Private Unitholders exchanged an annualized average of 5.2 million units.[244]  On the other hand, the Private Unitholder Defendants did not exchange any units since before 2016, exchanged few of their units after that, and did not face conditions favorable to future exchanges if Carlyle LP remained a

---

[239] *See In re Mindbody, Inc.*, 2020 WL 5870084, at *30 (Del. Ch. Oct. 2, 2020) (considering multiple facts and omissions in determining that disclosure deficiencies were material).

[240] Henry Aff., Ex. 5 at -0106.

[241] *Id.*

[242] *Id.* at -0162; Henry Aff., Ex. 16 at -0185.

[243] Henry Aff., Ex. 5 at -0162; Henry Aff., Ex. 16 at -0185.

[244] Foulds Aff., Ex. 2 at -2673.

partnership or engaged in an up-C restructuring.[245]  The Conflicts Committee was not informed of these facts.  Withholding that information precluded the Conflicts Committee from realizing that the intrinsic analyses were inapplicable to the Private Unitholder Defendants—the very individuals who could hold up the Conversion.

From there, the pleading standard carries Plaintiff the rest of the way.  It is reasonably conceivable that Carlyle Management withheld these facts to ensure the Conflicts Committee would approve the TRA Buyout at $344 million.  Withholding that information materially undermined the Special Approval provision's protections for the other investors.  The Special Approval safe harbor cannot establish a presumption of good faith.[246]

---

[245] Am. Compl. ¶ 67.

[246] Plaintiff also contends that Carlyle Management withheld from the Conflicts Committee other facts, including that the Conversion "was a far superior structure for the Private Unitholders" and Centerview had valued the Private Unitholders' TRA rights at less than $150 million.  D.I. 29 at Ans. Br. 62, 67.  This opinion concludes that Carlyle Management withheld or obfuscated other material facts from the Conflicts Committee sufficient to preclude the Special Approval, and does not reach the question of whether these additional facts were withheld or whether they were material.

Defendants also argue that the fact the LPA requires the Conflicts Committee "to consider 'only such interests and factors as it desires, including its own interests,'" precludes the implied covenant claim because it "leaves 'no gap to fill in the agreement' and eliminates any role for the implied covenant."  D.I. 23 at 67 (quoting LPA § 7.9(a); and then quoting *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021)).  I understand this argument to assert that this specific "sole discretion" standard itself addresses the implied covenant.  This argument, that a standard of decisionmaking displaces the implied covenant inherent in every contract, has been rejected by the Delaware Supreme Court.  *Gerber*, 67 A.3d at 418–21.

### ii. Reliance On Advisors

Defendants next argue that Carlyle Management is entitled to a conclusive good faith presumption because it relied on the advice of its advisors in connection with the Conversion, TRA Buyout, and related transactions. Section 7.10(b) of the LPA provides:

> [Carlyle Management] . . . may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion (including an Opinion of Counsel) of such Persons as to matters that [Carlyle Management] . . . believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such advice or opinion.[247]

This language creates four requirements to invoke the advisor safe harbor: (1) Carlyle Management must select the advisor; (2) Carlyle Management must consult with the advisor; (3) Carlyle Management must rely on the advice it receives; and (4) Carlyle Management must believe the matter was within the advisor's professional or expert competence. Reliance on advisors is a fact-intensive affirmative defense for which the defendants bear the burden.[248] In raising this defense, Defendants point to the advice of Perella Weinberg, Centerview, and E&Y.

---

[247] LPA § 7.10(b).

[248] *See Ogus v. SportTechie, Inc.*, 2020 WL 502996, at *14 (Del. Ch. Jan. 31, 2020).

Defendants point to Perella Weinberg's advice given at the Conflict Committee's July 17 meeting.[249] During the meeting, a Perella Weinberg representative conveyed that "the value of the proposed payment in connection with the proposed termination of the Company's tax receivable agreement seemed within the range of potential values currently attributed to the tax receivable agreement."[250] But as explained, Plaintiff has pled that Carlyle Management withheld information relevant to valuing the Private Unitholder Defendants' TRA rights from the Conflicts Committee. The material information Carlyle Management knew, but withheld from the Conflicts Committee, was not reflected in Perella Weinberg's presentation. From there, it is reasonable to infer that Perella Weinberg's recommendation did not account for that information. It follows that Carlyle Management knew Perella Weinberg's evaluation was either not fully informed or incorrect. On these facts, it is reasonably conceivable that Carlyle Management did not rely on Perella Weinberg's advice in deciding to proceed with the TRA Buyout.[251]

---

[249] D.I. 23 at 63–64 (citing Henry Aff., Ex. 15 at -0011; and Henry Aff., Ex. 16 at -0173).

[250] Henry Aff., Ex. 15 at -0011.

[251] Because Carlyle Management knew the expert advice omitted material information, Carlyle Management's reliance on that advice in order to obtain a safe harbor may itself be a breach of the implied covenant. *See Gerber*, 67 A.3d at 421–22.

Carlyle Management also points to the retention of Centerview. But Carlyle LP was the counterparty to Centerview's engagement letter, which makes no mention of Carlyle Management.[252] Nothing in the record reflects that Carlyle Management, as opposed to Carlyle LP, selected Centerview as an advisor or consulted with it.[253] Further, Carlyle Management has not pointed to any advice of Centerview it relied on—instead it addresses Plaintiff's arguments before stating that "what matters is that Carlyle Management relied on a professional advisor's advice in ultimately approving the TRA Buyout—specifically, the advice of Perella Weinberg."[254]

Finally, Defendants argue Carlyle Management relied on E&Y's advice. An entity called Carlyle Investment Management LLC retained E&Y.[255] The parties have provided no indication of what Carlyle Investment Management LLC is or its

---

[252] Henry Aff., Ex. 8 at 6. Carlyle Management does not press that it, rather than Carlyle LP, retained Centerview. *See, e.g.*, D.I. 23 at 9 (describing Centerview's hiring in the passive voice); *id.* at 62 (stating "Carlyle LP engaged financial advisors," then describing Centerview's engagement in the passive voice). To be sure, Carlyle Management was responsible for Carlyle LP's day-to-day management, and Carlyle Management's board of directors served as the Board. But Defendants have not argued that the separate legal existence of Carlyle Management and Carlyle LP should be ignored for purposes of Section 7.10(b).

[253] *See* LPA § 7.10(b) (offering a conclusive presumption of good faith where the decisionmaker consulted with advisors "selected by it").

[254] D.I. 23 at 63.

[255] Henry Aff., Ex. 9 at 7. As with Centerview's retention, Carlyle Management has not addressed this point. See *supra* note 252.

63

relationship to Carlyle Management. For purposes of this motion, I conclude Carlyle Management did not retain E&Y.

Even had Carlyle Management retained E&Y, it has not pointed to any advice it relied on or could have relied on relating to the TRA Buyout. The record reflects that E&Y advised on the tax implications of the Conversion generally and on structuring the Conversion and related transactions, which is insufficient to show reliance for purposes of the separate issue of the TRA Buyout's fairness, necessity, or price.[256] At this stage, Carlyle Management has failed to establish that it relied on advice from any advisor it selected in approving the TRA Buyout.

### b. Subjective Bad Faith

Plaintiff has demonstrated that neither safe harbor applies. But the good faith presumption nevertheless applies unless Plaintiff establishes that Carlyle Management "subjectively believed" the TRA Buyout was not in Carlyle LP's best interests.[257] Of course, Carlyle Management is an entity and therefore is incapable of having any subjective beliefs.[258] Instead, the Court must look to the subjective

---

[256] Henry Aff., Ex. 32.

[257] LPA § 7.9(a).

[258] *See N. Assur. Co. v. Rachlin Clothes Shop*, 125 A. 184, 188 (Del. 1924) ("A corporation being a purely metaphysical creature, having no mind with which to think, no will with which to determine and no voice with which to speak, must depend upon the faculties of natural persons to determine for it its policies and direct the agencies through which they are to be effectuated."); *see also* 2A C.J.S. Agency § 476 (Mar. 2024 update) ("Knowledge can always be imputed to a corporation, even when used to determine a subjective mental

64

beliefs of the Board.[259]  Those individuals' "personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction."[260]

Plaintiff's showings that Carlyle Management withheld or obfuscated facts tending to show the TRA rights were nearly worthless to the Private Unitholder Defendants, and told the Conflicts Committee the TRA would be terminated, supports the pleading-stage inference that Carlyle Management subjectively believed that paying $344 million for those rights was not in Carlyle LP's best interest.  It is reasonable to infer Carlyle Management skewed the information presented to the Conflicts Committee concerning the value of future exchanges to the Private Unitholder Defendants because those facts would have shown that the TRA rights were worth far less to the Private Unitholder Defendants than the agreed

---

state, because a corporation has no belief or intent independent of that of its officers and agents.").

[259] *See Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1118–20 (Del. 2022); *Dieckman v. Regency GP LP*, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021) ("[D]etermining whether the General Partner acted in bad faith or engaged in fraud or willful misconduct turns on the state of mind of the directors on the Board who voted to approve or otherwise authorized a challenged action."), *aff'd*, 264 A.3d 641 (Del. 2021); *see also* James L. Burns, *Pruning the Judicial Oak: Developing A Coherent Application of Common Law Agency and Controlling Person Liability in Securities Cases*, 93 Colum. L. Rev. 1185, 1196 (1993) ("A corporate entity cannot act in 'good faith' or have a 'reasonable belief,' so these attributes must be imputed to the corporation from its executives.").

[260] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 107 (Del. 2013).

TRA Buyout price. It is reasonable to infer that Carlyle Management believed Carlyle LP was overpaying for those rights and therefore that the TRA Buyout was not in Carlyle LP's best interests. It follows that the good faith presumption is not available, and that Plaintiff has pled that Carlyle Management fell short of the good faith standard required by LPA Sections 7.6(d) and (e).

## 2. Tortious Interference With The LPA

Count VIII asserts a claim for tortious interference with the LPA against Clare, Hance, Rubenstein, D'Aniello, Youngkin, Buser, Ferguson, Finn, and Conway. Defendants first argue this claim fails because Plaintiff failed to plead a predicate breach. As explained, Plaintiff pled a claim that Carlyle Management breached the implied covenant of good faith and fair dealing by withholding information from the Conflicts Committee, and also pled that Carlyle Management breached the good faith requirements in Sections 7.6(d) and (e).[261] Plaintiff satisfied the predicate breach requirement.

From there, Defendants argue only that there is a presumption that these defendants were acting within the scope of their agency. "It is well settled that a party to a contract cannot be held liable for [both] breaching the contract and for

---

[261] A breach of the implied covenant can satisfy the requirement of a predicate breach. *See NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*25–27 (Del. Ch. Nov. 17, 2014).

tortiously interfering with that contract."[262] Where an entity is a party to an agreement, that entity's agent can be liable for tortious interference with the agreement where she "acted beyond the scope of [her] agency."[263] "Acts carried out for an employee's personal motives—rather than for the employer's benefit—are outside the scope of employment and can amount to interference with a contract."[264] "Delaware law presumes that a corporate officer's actions that cause the corporation to breach a contract were taken for the corporation's benefit."[265] A plaintiff can rebut that presumption by pleading "that the officer (1) 'was not pursuing legitimate profit-seeking activities of the affiliated enterprise in good faith,' or (2) 'was motivated by some malicious or other bad faith purpose to injure the plaintiff.'"[266]

I concluded that Plaintiff pled these defendants withheld or obfuscated information from the Conflicts Committee while acting as Carlyle Management

---

[262] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009).

[263] *Am. Bottling Co. v. Repole*, 2020 WL 7787043, at *6 (Del. Super. Dec. 30, 2020).

[264] *Id.*

[265] *Id.*

[266] *Id.* (quoting *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *15–16 (Del. Super. Apr. 24, 2018)); *see also* Restatement (Second) of the Law of Torts § 770 ("One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if the actor (a) does not employ wrongful means and (b) acts to protect the welfare of the third person." (formatting altered)); *id.* at cmt. b ("The rule stated [in Section 770] is frequently applicable to those who stand in a fiduciary relation toward another, as in the case of . . . corporate officers acting for the benefit of the corporation.").

67

agents.[267]  And as explained, to plead a claim for tortious interference against them, Plaintiff must allege they exceeded the scope of their agency.  Though Plaintiff has pled a claim that these defendants acted as Carlyle Management's agents in connection with Carlyle Management's breaches of the LPA, Plaintiff may plead in the alternative under Court of Chancery Rule 8.[268]  I conclude Plaintiff has done so here.  Each named defendant personally received payments in connection with the TRA Buyout.  Plaintiff alleged the named defendants intentionally deceived the Conflicts Committee so they could obtain the TRA Buyout payment at Carlyle LP's expense.[269]  It is not clear from the face of the Amended Complaint how those actions benefitted Carlyle Management, which did not receive a TRA Buyout payment.  It is reasonable to infer each defendant's pursuit of the TRA Buyout was in his own interest, as opposed to Carlyle Management's.  Plaintiff has stated a claim for tortious interference with the LPA.

---

[267] In addressing the breach of contract claims, the parties did not address which Defendants ensured information did not reach the Conflicts Committee.  I understand Plaintiff to be asserting this claim against those same individuals.

[268] Ct. Ch. R. 8(e)(2); *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 307 (Del. Ch. 2022) ("Court of Chancery Rule 8 expressly permits a plaintiff to plead in the alternative.").

[269] *Smith v. Hercules, Inc.*, 2002 WL 499817, at *3 (Del. Super. Mar. 28, 2002) ("If Plaintiffs can establish that [the CEO's] actions were not motivated by, and for, his corporate responsibilities, but were instead principally executed to further his personal investments, [the CEO] may be held liable for causing the breach.").

### B. The Initial Transfer Unit Claims

Plaintiff alleges the Initial Transfer Units were not transferred to Intermediate Holdco I but that the Private Unitholder Defendants nevertheless received the Deferred Payments. On that basis, Plaintiff asserts claims for breach of MRA Section 3.1, tortious interference with the MRA, and unjust enrichment.

#### 1. Breach Of The MRA

Section 3.1(b) of the MRA required Holdings I GP Sub and Intermediate Holdco II to "transfer to [Intermediate Holdco I] on behalf of [the Private Unitholders] a number of [units] of equivalent value to [$344 million]."[270] This decision refers to those units as the Initial Transfer Units. Following that transfer, Intermediate Holdco I was to make the Deferred Payments to the Private Unitholders.[271]

Plaintiff asserts Intermediate Holdco I, Holdings I GP Sub, Intermediate Holdco II, Clare, Rubenstein as trustee of the David M. Rubenstein Revocable Trust, D'Aniello as trustee of the D'Aniello Revocable Trust, Youngkin as trustee of the Glenn A. Youngkin Revocable Trust, and Conway as trustee of the William E.

---

[270] MRA § 3.1(b).

[271] *Id.* § 3.1(a).

Conway Jr. 2006 Revocable Trust breached the MRA by failing to transfer the Initial Transfer Units.[272]

Defendants contest these breaches on three narrow grounds: (1) the individual defendants named were not parties to the MRA, and even if they were, they owed no duties and therefore could not breach the MRA; (2) a November 2020 presentation reflects that Initial Transfer Units were transferred; and (3) Plaintiff failed to plead damages. Defendants prevail on the first argument, but fall short on the second and third.

### a. Breach Of The MRA Against Clare, Rubenstein, D'Aniello, Youngkin, and Conway

"The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy."[273] One cannot breach an agreement under which she owes no duties.[274]

---

[272] The Amended Complaint also alleges the MRA was breached because a "nationally recognized valuation firm" did not determine the number of Initial Transfer Units that should be transferred in exchange for the Deferred Payments. Am. Compl. ¶ 176. Defendants did not address these allegations. Plaintiff addressed them quickly in its answering brief. *See* D.I. 29 at Ans. Br. 46–47. Defendants did not mention them in reply. To the extent Plaintiff is pursuing a standalone breach of contract claim on this basis, Defendants have not moved to dismiss it.

[273] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[274] *See Inter-Mktg. Grp. USA, Inc. ex rel. Plains All Am. Pipeline, L.P. v. Armstrong*, 2020 WL 756965, at *8 (Del. Ch. Jan. 31, 2020) ("[O]nly the General Partner owed a

Plaintiff has not pled that Clare or Rubenstein, D'Aniello, Youngkin, and Conway, in their capacity as trustees or otherwise, breached the MRA by failing to transfer the Initial Transfer Units. Holdings I GP Sub and Intermediate Holdco II owed a duty to perform under the MRA—not Clare, Rubenstein, D'Aniello, Youngkin, and Conway. Because they were not obligated to transfer the units, they could not have breached. Count VI is dismissed as to Clare, Rubenstein, D'Aniello, Youngkin, and Conway.

### b. Breach Of The MRA Against Holdings I GP Sub And Intermediate Holdco II

Plaintiff has pled a claim for breach of the MRA against Holdings I GP Sub and Intermediate Holdco II. Immediately before the Conversion, the Private Unitholders held 229 million Subsidiary Holdco Units.[275] Approximately 26 million of those units, which this decision refers to as the Initial Transfer Units, were to be transferred to Intermediate Holdco I in exchange for the Deferred Payments.[276] Then, the Remaining Units were to be exchanged for Carlyle Inc. common stock on

---

freestanding contractual duty, and breach of contract claims (Count I) against all Defendants except the General Partner are dismissed for failure to state a claim under Rule 12(b)(6), as they owed no duties under the LP Agreement."); *see also In re WeWork Litig.*, 2020 WL 6375438, at *11 (Del. Ch. Oct. 30, 2020) ("This aspect of Count I . . . fails to state an independent basis for a breach of contract claim against [the defendant] because it owed no obligations under Section 1.02.").

[275] Am. Compl. ¶ 169.

[276] MRA § 3.1(b).

71

a one-for-one basis.[277]  On January 1, Buser sent a letter to the American Stock Transfer & Trust Company directing the transfer of 228,028,388 shares of Carlyle Inc. common stock to the Private Unitholders.[278]  It is reasonable to infer that Holdings I GP Sub and Intermediate Holdco II failed to transfer the Initial Transfer Units in breach of the MRA.

Defendants argue the Initial Transfer Units were transferred, pointing to a November 23, 2020, presentation that states 26.3 million of the Private Unitholders' Subsidiary Holdco Units had been exchanged in connection with the TRA Buyout.[279]  This document directly conflicts with Buser's January 1 letter, which directs the transfer of over 228 million shares of Carlyle Inc. common stock.[280]  At best, the November presentation gives rise to a competing inference that the Initial Transfer Units were exchanged for the Deferred Payments.  The Court cannot resolve this conflict at this stage, and must draw all reasonable inferences in Plaintiff's favor.[281]

---

[277] *Id.*; Plan of Conver. § 2.01.

[278] Foulds Aff., Ex. 5 at -2578.

[279] Henry Aff., Ex. 3 at -2356 to -2357.

[280] Foulds Aff., Ex. 5 at -2578.

[281] *IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 632 (Del. Ch. 2023) ("At the pleading stage, the court does not decide between competing inferences.  The plaintiff receives the benefit of the inference that favors its case."); *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1181 (Del. Ch. 2022) ("If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiffs made a well-pled factual allegation, then the court must credit the allegation."); *Repole*, 2020 WL 7787043, at *9 ("[T]he

### c. Breach Of The MRA Against Intermediate Holdco I

Plaintiff alleges Intermediate Holdco I breached the MRA by making the Deferred Payments despite the failure to transfer the Initial Transfer Units. Section 3.1(a) of the MRA provides that Intermediate Holdco I "shall agree to make payments to" the Private Unitholders "whose [Initial Transfer Units] are transferred to [Intermediate Holdco I] pursuant to Section 3.1(b)."[282] Defendants seek dismissal of this claim solely on the grounds that the Initial Transfer Units were transferred. As explained, Plaintiff has pled the unit transfer did not occur.

### d. Plaintiff Has Pled Carlyle Inc. Was Damaged By The Breaches.

Finally, Defendants argue Plaintiff's breach claim should be dismissed because it failed to plead damages.[283] A plaintiff must plead damages for a breach of contract claim to survive a motion to dismiss.[284] Plaintiff has pled damages in the form of a dilutive overpayment to the Private Unitholders.

Because the Initial Transfer Units were not transferred, the Private Unitholders received Carlyle Inc. common stock on a one-for-one basis for over 228

---

competing inferences that can be drawn from the text messages cannot be resolved in a pleadings-based motion.").

[282] MRA § 3.1(a) (emphasis omitted).

[283] Defendants do not appear to contest the existence of damages for the breach of contract claim against Intermediate Holdco I.

[284] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *11 (Del. Ch. Jan. 25, 2013) ("[D]amages are a necessary element of a breach of contract claim.").

million Subsidiary Holdco Units—not just their Remaining Units. Put differently, they received—and Carlyle Inc. issued—about 26.3 million shares more than they were entitled to under the MRA. This overissuance was dilutive.[285] Our law recognizes that claims for dilution cause harm to the company.[286] Plaintiff has pled Carlyle Inc. was damaged by the overissuance.

* * *

Plaintiff has pled a claim for breach of the MRA against Holdings I GP Sub, Intermediate Holdco I, and Intermediate Holdco II. Plaintiff's claim for breach of the MRA against Clare, Rubenstein, D'Aniello, Youngkin, and Conway is dismissed.

### 2. Tortious Interference With The MRA

Count VIII asserts a claim for tortious interference with the MRA against Clare, Hance, Rubenstein, D'Aniello, Youngkin, Buser, Ferguson, Finn, and Conway. Defendants argue that Plaintiff failed to plead a predicate breach.[287] As

---

[285] This is so even though, as Defendants point out, the Initial Transfer Units eventually ended up in Carlyle Inc.'s possession, because more Carlyle Inc. shares were issued than should have been under the MRA.

[286] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1266 (Del. 2021).

[287] Defendants also argued that Plaintiff lacks standing to bring the tortious interference claim because it is not a party to the MRA. Plaintiff's claim is derivative, and Defendants did not argue Plaintiff lacked standing to proceed derivatively so long as Plaintiff pled demand futility.

explained, Plaintiff has pled a predicate breach. Defendants' motion is denied as to this claim.

### 3. Unjust Enrichment

Count IX asserts a claim for unjust enrichment against the Private Unitholder Defendants. To state a claim for unjust enrichment, a plaintiff must plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, and (4) the absence of justification."[288] A plaintiff's claim for unjust enrichment may be dismissed where the parties' relationship is governed by contract.[289] At least at the pleading stage, our courts have denied motions to dismiss unjust enrichment claims based on the receipt or retention of overpaid or wrongfully

---

Defendants further argued that Plaintiff cannot bring a tortious interference claim against Clare because he is a party to the MRA. "Under the tort of interference with an existing contract, the principle that a party to the contract cannot be sued thereunder for interference is well settled in Delaware." *CPM Indus., Inc. v. ICI Ams., Inc.*, 1990 WL 28574, at *1 (Del. Super. Feb. 27, 1990). Plaintiff offered no response. This count is dismissed as against Clare.

[288] *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *28 (Del. Ch. Oct. 26, 2022) (citing *Garfield*, 277 A.3d at 341–51).

[289] *Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) ("Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."), *aff'd*, 991 A.2d 1120 (Del. 2010); *accord Kuroda*, 971 A.2d at 891 ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim.").

obtained consideration under a valid, enforceable agreement.[290]  Defendants' motion

is denied as to the unjust enrichment claim.

### C. Post-Closing Breach Of Fiduciary Duty Claims

I now turn to Plaintiff's post-Conversion breach of fiduciary duty claims.

After Buser became Carlyle Inc.'s CFO on January 1, he directed the transfer of

228,028,388 shares to the Private Unitholders to occur on January 2, notwithstanding

the failure to transfer their Initial Transfer Units.[291]  As explained, this figure

exceeded the number of shares to which the Private Unitholders were entitled under

the MRA.  For purposes of this motion, it is reasonable to infer that transfer occurred

---

[290] *See Pfeiffer v. Leedle*, 2013 WL 5988416, at \*10 (Del. Ch. Nov. 8, 2013) (denying a motion to dismiss an unjust enrichment claim on the basis that a contract governs the parties' relationship where the plaintiff pled the defendant received more stock options than he was entitled to under a valid and enforceable stock incentive plan); *see also Garfield*, 277 A.3d at 340–51 (denying a motion to dismiss an unjust enrichment claim based on an alleged overpayment under a valid and enforceable equity compensation plan); *Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007) (denying a motion to dismiss an unjust enrichment claim based on an allegedly wrongful receipt of stock options under an enforceable stock option plan).  To be sure, the plaintiff in *Pfeiffer* did not assert a breach of contract claim for the same conduct.  I find this distinction irrelevant as I have concluded Plaintiff did not plead a breach of contract against the defendants who were allegedly unjustly enriched.  Where, as here, the contract claim and the unjust enrichment claim arise from a common nucleus of fact such that dismissing one of the claims is unlikely to simplify discovery or the presentation of evidence, and because there is no right to a pleading stage ruling, there is no benefit to be gained from dismissing the unjust enrichment claim.  *See Garfield*, 277 A.3d at 360–62.

[291] Foulds Aff., Ex. 5 at -2578.  Because Buser sent the letter as Carlyle Inc.'s CFO, I infer that it was sent after the Conversion was completed.

on or after January 2. The first Deferred Payment was made on January 31, 2020, and three more were made before Plaintiff filed its Amended Complaint.[292]

Plaintiff alleges that the Director Defendants breached their fiduciary duties by failing to prevent Carlyle Inc. from making the Deferred Payments and overissuing Carlyle Inc. stock to the Private Unitholders. Plaintiff also asserts a breach of fiduciary duty claim against Clare, Hance, Rubenstein, D'Aniello, Youngkin, and Conway for receiving the Deferred Payments and overissued shares in clear violation of the MRA. And Plaintiff brings claims for breach of fiduciary duty stemming from violations of Sections 152 and 153 of the DGCL. Finally, Plaintiff asserts a breach of fiduciary duty claim against the Founders as a control group. Plaintiff's claim against the Founders as a control group fails. The other claims survive.

### 1. Section 152

Plaintiff contends that Carlyle Inc. violated Section 152 of the Delaware General Corporation Law by issuing 26.3 million shares of unauthorized stock, and that the Director Defendants breached their fiduciary duties by causing, allowing, or failing to prevent that violation.[293] Defendants appear to argue that no violation of

---

[292] MRA § 3.1(a).

[293] Defendants do not argue that such a claim cannot be brought as a claim for breach of fiduciary duty.

Section 152 occurred because the Board approved the stock issuances necessary to effectuate the MRA.

The relevant version of Section 152 provides:

> The consideration, as determined pursuant to § 153(a) and (b) of this title, for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine. . . . The board of directors may determine the amount of such consideration by approving a formula by which the amount of consideration is determined.[294]

A board of directors may delegate this power so long as it does so through a resolution that: "(i) fixes the maximum number of shares that may be issued; (ii) sets a time period during which such shares may be issued; and (iii) establishes a minimum amount of consideration for which such shares may be issued."[295] Plaintiff pled that Buser's letter directing the issuance of Carlyle Inc. common stock authorized not only stock sufficient to exchange the Remaining Units, but also an additional 26.3 million shares in exchange for the Initial Transfer Units. The question is whether his direction to issue shares in exchange for the Initial Transfer Units was done pursuant to a proper delegation of authority under Section 152.

---

[294] 8 *Del. C.* § 152 (2015). Section 152 was amended in 2022. 83 Del. Laws. ch. 377 § 3 (2022). It was again amended in 2023. 84 Del. Laws. ch. 98 § 1 (2023). This opinion applies the statute as it read at the time of the Conversion. *See Fountain v. State*, 139 A.3d 837, 841 (Del. 2016) ("It is a general rule that statutory amendments operate prospectively unless the legislature expressly states, to the contrary, that the amendments shall be retrospective.").

[295] I Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 152.01, at 5-57 (7th ed. 2020).

The Board granted broad authority to the Transaction Committee to effectuate the Conversion and related transactions.[296] The Transaction Committee authorized the issuance of Carlyle Inc. common stock "as provided in the Plan of Conversion" and MRA.[297] Through formulas set forth in those agreements, the Transaction Committee authorized the issuance of only enough shares of Carlyle Inc. common stock to convert specified types of partnership units and the Private Unitholders' Remaining Units on a one-for-one basis—it did not authorize the issuance of additional stock to convert the Initial Transfer Units.[298] Though the Transaction Committee gave Carlyle LP's officers and other agents authority to take actions "necessary, desirable or appropriate" to effectuate those agreements, it did not delegate to them authority to issue additional Carlyle Inc. shares to the Private Unitholders.[299] Thus, through the MRA, the Transaction Committee authorized the

---

[296] Henry Aff., Ex. 20 at 6. The mechanics and effectiveness of the authorization and delegation to the Transaction Committee are unchallenged.

[297] Henry Aff., Ex. 26 at -0195.

The Transaction Committee resolved "that the resolutions adopted by the Transaction Committee pursuant to this written consent shall have the effect . . . after the effectiveness of the Conversion, of [Carlyle Inc.'s] Board taking them on behalf of [Carlyle Inc.]." *Id.* at -0199. The mechanics and effectiveness of the Transaction Committee's resolution are unchallenged and so I assume compliance with Section 152.

[298] The Plan of Conversion contemplated issuing shares of common stock equal to the number of outstanding units in three types of partnership securities. Plan of Conver. § 2.01(i). The MRA contemplated Carlyle Inc. issuing shares of common stock of equal value to the number of Subsidiary Holdco Units held by the Private Unitholders following the transfer of the Initial Transfer Units. MRA § 9.1(b).

[299] Henry Aff., Ex. 26 at -0199 to -0200.

79

issuance of roughly 201,728,388 shares of common stock, representing the 228,028,388 units the Private Unitholders held immediately before the Conversion minus the 26.3 million Initial Transfer Units.

Nevertheless, Buser's letter directed the transfer of 228,028,388 shares of Carlyle Inc. common stock.[300] This exceeds the number of authorized shares. Because those issuances lacked the required authorization, Plaintiff has pled a violation of Section 152. Defendants raise no other reason to dismiss this breach of fiduciary duty claim.

### 2. Section 153

Count I also asserts a claim for breach of fiduciary duty for causing, allowing, or failing to prevent Carlyle Inc. from violating 8 *Del. C.* § 153. Section 153(a) provides that "[s]hares of stock with par value may be issued for such consideration, having a value not less than the par value thereof, as determined from time to time by the board of directors, or by the stockholders if the certificate of incorporation so provides."[301]

As explained, the 26.3 million overissued shares were unauthorized. The parties did not meaningfully brief whether this lack of authorization also caused a

---

[300] Foulds Aff., Ex. 5 at -2578.

[301] 8 *Del. C.* § 153(a) (1969). Section 153 was amended in 2022. 83 Del. Laws. ch. 377 § 4 (2022). It was again amended in 2023. 84 Del. Laws. ch. 98 § 2 (2023). This opinion applies the statute as it read at the time of the Conversion. *See Fountain*, 139 A.3d at 841.

violation of the version of Section 153 then in effect.  The motion to dismiss is denied as to this claim.

### 3.    Dereliction of Duty

Count I alleges the Director Defendants breached their fiduciary duties "by knowingly and intentionally causing or allowing Carlyle [Inc.] to make substantial overpayments and share over-issuances to the [Private Unitholders] on terms that the Director Defendants knew disproportionately benefitted the [Private Unitholder Defendants] and were not entirely fair to the public stockholders."[302]  Count III asserts a claim for breach of fiduciary duty against Lee, Youngkin, Ferguson, Hance, Clare, Finn, and Buser (the "Officer Defendants").  It alleges they breached their fiduciary duties of care, loyalty, and good faith by "knowingly and intentionally causing or allowing Carlyle [Inc.] to make substantial overpayments and share over-issuances to the [Private Unitholders] on terms that [they] knew disproportionately benefitted the [Private Unitholder Defendants] and were not entirely fair to the public stockholders."[303]

Plaintiff is not bringing a breach of fiduciary duty claim relating to the negotiation, consideration, and approval of the Conversion and related transactions, including the TRA Buyout—it could not do so, as Carlyle LP directors did not owe

---

[302] Am. Compl. ¶ 255.

[303] *Id.* ¶ 268.

81

fiduciary duties under the LPA.[304]  After the Conversion became effective on January

1, 2020,[305] Carlyle Inc.'s directors and officers owed the "fundamental fiduciary

duties of loyalty and care to the corporation and its shareholders."[306]  Plaintiff asserts

Carlyle Inc.'s fiduciaries acted in bad faith by failing to stop the Deferred Payments

and share overissuance even though they knew such payments were being made in

furtherance of a scheme to extract value at the expense of the unaffiliated

stockholders.  Plaintiff's claim sounds in the duty of loyalty's subsidiary element of

good faith.[307]  A plaintiff can plead a claim for bad faith by alleging facts

demonstrating "intentional dereliction of duty, [or] a conscious disregard for one's

responsibilities."[308]  Officers of a Delaware corporation owe the same fiduciary

duties as directors.[309]

Defendants contest these claims on relatively narrow grounds.  They do not

meaningfully challenge Plaintiff's allegation that the Director Defendants or Officer

---

[304] Defendants nevertheless argue that Plaintiff is essentially attacking those decisions and the Court should evaluate Plaintiff's claims as such.  I understand Plaintiff's argument to rely on the pre-Conversion period as establishing that these defendants were aware of or participated in the alleged scheme that concluded with the MRA breaches.

[305] Plan of Conver. § 1.02; *id.* at Ex. A at 31.

[306] *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986); *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009) (holding officers owe the same fiduciary duties as directors).

[307] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[308] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006).

[309] *Gantler*, 965 A.2d at 708–09.

Defendants knew about the share overissuance.[310] Rather, they point out that the validity of the underlying agreements is undisputed and argue that the named defendants acted pursuant to binding contractual commitments. From there, they conclude that noncompliance would likely result in litigation, and so their compliance cannot have been a breach of fiduciary duty.[311]

A director's fiduciary duties do not give her extraordinary powers to escape from a contract for the benefit of the corporation or its stockholders.[312] Nevertheless, as this Court explained in *Frederick Hsu Living Trust v. ODN Holding Corporation,* the existence of a binding contract does not preclude the applicability of fiduciary duties in determining how to handle that contract:

---

[310] Defendants address this issue only by prefacing a sentence with the introductory clause: "Setting aside conclusory allegations of "participat[ion]" and "aware[ness] . . . ."  D.I. 23 at 53 (alterations in original) (quoting Am. Compl. ¶ 216).  I do not read this language as a challenge to the merits of Plaintiff's claim.

[311] Defendants' arguments, and Plaintiff's response, overlook many issues.  For example, Defendants do not challenge that the Board could have stopped the Deferred Payments despite the fact Intermediate Holdco I, not Carlyle Inc., was responsible for making the Deferred Payments.  MRA § 3.1(a).  The parties make no distinction between the knowledge of any individual defendant, including between those in the Conversion Working Group and those on the Conflicts Committee.  And the parties do not distinguish between the role of the Director Defendants and the Officer Defendants in both perpetrating the scheme and failing to stop the scheme once they became fiduciaries.  For example, the Amended Complaint alleges Buser actively carried out the scheme by withholding information from the Conflicts Committee and directing the overissuance, while there are no allegations as to the role many other Officer Defendants played.  I take on only the arguments Defendants raised.

[312] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *23 (Del. Ch. Apr. 14, 2017) ("It is true that the fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts.").

83

> [T]he fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handle those contractual obligations; it rather means that the directors must evaluate the corporation's alternatives in a world where the contract is binding. Even with an iron-clad contractual obligation, there remains room for fiduciary discretion because of the doctrine of efficient breach.[313]

And so, directors must exercise their fiduciary duties in deciding how to proceed in the face of an agreement, understanding they are no differently situated than any other contractual counterparty.[314] The existence of such a contract "does not foreclose the fiduciary standard of conduct from governing."[315]

I read Defendants' argument as amounting to no more than a declaration that the existence of a valid contract forecloses Plaintiff's breach of fiduciary duty claim. That is inconsistent with our law. And Defendants' perception of the MRA's sanctity is in question: Plaintiff pled multiple breaches, including the failure to

---

[313] *Id.* at *24.

[314] *Id.* ("[A] party to a contract may decide that its most advantageous course is to breach and pay damages. Just like any other decision maker, a board of directors may choose to breach if the benefits (broadly conceived) exceed the costs (again broadly conceived)."); *see Hokanson v. Petty*, 2008 WL 5169633, at *6 (Del. Ch. Dec. 10, 2008) (noting that the argument that directors should have caused a company to breach a contract and invited a valid breach claim would still leave the company in the same place as if the company had performed was "unsustainable").

Defendants' argument depends on the premise that the Director Defendants and Officer Defendants were bound to perform under the MRA and lacked the discretion to deviate from its terms. But Plaintiff alleges that they already did so in executing the share overissuance.

[315] *Frederick Hsu*, 2017 WL 1437308, at *24.

transfer the Initial Transfer Units. From there, the parties did not seriously brief the issue. Defendants' narrow legal challenge fails to establish that Plaintiff cannot recover under any set of facts. Defendants made no other argument that Plaintiff failed to state a claim for breach of fiduciary duty.

### 4. Receipt Of The Deferred Payments And Overissued Shares

Plaintiff alleges Lee, Youngkin, Ferguson, Hance, Clare, Finn, and Buser breached their fiduciary duties by "receiving the TRA Buyout payments and the" overissued shares "in violation of clear and unambiguous provisions of the [MRA] and 8 *Del. C.* [§§] 152–153."[316] Plaintiff pled that Carlyle Inc. overissued shares in violation of the MRA, and that each of these defendants received those overissued shares. Past decisions out of this Court have concluded that plaintiffs state a claim for breach of fiduciary duty by alleging that a fiduciary received stock options, grants, or other similar awards in violation of the applicable compensation plan or agreement where the recipient knew or should have known that such awards violated the applicable plan or agreement.[317] I find those cases instructive and applicable

---

[316] Am. Compl. ¶ 269.

[317] *Garfield*, 277 A.3d at 334–35; *Pfeiffer*, 2013 WL 5988416, at *10; *Weiss v. Swanson*, 948 A.2d 433, 449 (Del. Ch. 2008); *see also Ryan*, 918 A.2d at 356 ("Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand.").

here.  Plaintiff pled a claim for breach of fiduciary duty against these defendants for receipt of the overissued shares.

As for receipt of the Deferred Payments,  Defendants contest this claim only by reciting the truism that a fiduciary is not required to "sacrifice benefits to which they are legally entitled simply because the remaining stockholders, all of whom were aware of the arrangement through public disclosures, might have preferred a 'better deal.'"[318]  But Plaintiff is challenging the receipt of benefits that were the product of multiple breaches of the LPA—breaches in which at least some of these defendants participated in personally—and Plaintiff has pled that these same defendants breached their fiduciary duties by failing to prevent those breaches of contract.  At this stage, it is reasonably inferable that the Deferred Payments were the product of an impermissible scheme to enrich certain Defendants at the expense of Carlyle Inc. and its stockholders.  Defendants' narrow challenge to this claim fails.

Defendants' arguments as to the rest of Count III are identical to their arguments as to Count I.  Thus, the outcome is the same.

---

[318] D.I. 23 at 56–57 (citing *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1041 (Del. Ch. 2012)).

### 5. Breach Of Fiduciary Duty Against The Founders As A Control Group

Count II asserts a claim for breach of fiduciary duty against the Founders as controllers of Carlyle Inc. Plaintiff contends "the Founders acted together with the shared goal of pushing through the Tax-Free Exchange and TRA Buyout on terms they knew were not entirely fair to the public stockholders."[319] Defendants argue Plaintiff failed to plead the existence of a control group.

There are "two scenarios in which a stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'"[320] "[O]ur law recognizes that multiple stockholders together can constitute a control group exercising majority or effective control, with each member subject to the fiduciary duties of a controller."[321] "The alleged members of a control group . . . must be 'connected in some legally significant way'—such as 'by contract, common

---

[319] Am. Compl. ¶ 263.

[320] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (emphasis omitted) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del.1994)), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[321] *Sheldon v. Pinto Tech. Ventures, L.P.,* 220 A.3d 245, 251 (Del. 2019).

ownership, agreement, or other arrangement—to work together toward a shared goal.'"[322]

Defendants argue that the Founders do not constitute a control group because the Founders were not connected in a "legally significant way" and because Carlyle Management did not control Carlyle Inc. after the Conversion. Plaintiff did not address these arguments in its answering brief. Defendants pointed out that Plaintiff failed to respond in their reply brief.[323] Plaintiff did not make any argument on this point at the hearing. Plaintiff waived this argument by failing to make it in its answering brief.[324] Count II is dismissed.

### D. Breach Of Carlyle Inc.'s Charter

Count VII asserts a claim for breach of Carlyle Inc.'s charter against Carlyle Inc. Plaintiff argues that Carlyle Inc. breached its charter by violating Sections 152 and 153. "[T]he DGCL forms a part of every Delaware corporation's charter."[325]

---

[322] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) (quoting *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009)).

[323] D.I. 34 at 17.

[324] *Raj & Sonal Abhyanker Fam. Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *4 n.24 (Del. Ch. June 17, 2021) ("Because Plaintiff failed to respond to this argument in its answering brief, any response is deemed waived.").

[325] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049 (Del. Ch. 2015) (citing 8 *Del. C.* § 394) (collecting cases); 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation.").

"[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."[326] "The elements of a breach of charter claim are the same as a breach of contract claim."[327] As explained above, I have concluded Plaintiff adequately pled a violation of DGCL Section 152, and perhaps Section 153. It follows that Plaintiff has pled a violation of Carlyle Inc.'s charter. The motion to dismiss is denied as to Count VII.

### III. CONCLUSION

The motion to dismiss is **GRANTED** as to Count II. The motion is **GRANTED IN PART** as to Counts VI and VIII. The motion is **DENIED** as to Counts I, III, IV, V, VII, and IX. The parties shall submit a stipulated proposed order to that effect, as well as a scheduling order for the remainder of the case.

---

[326] *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) (citing *Lawson v. Household Fin. Corp.*, 152 A. 723, 727 (Del. 1930)).

[327] *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *20 n.171 (Del. Ch. Aug. 27, 2018) (citing *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385–86 (Del. 2012)).